Ofelia RANDLE, Plaintiff–Appellant,

v.

CITY OF AURORA, Defendant–Appellee.

No. 94–1137.

United States Court of Appeals,
Tenth Circuit.

Oct. 26, 1995.

---

Neal S. Cohen of Chrisman, Bynum & Johnson, P.C., Boulder, Colorado (Rebecca L. Fischer with him on the briefs), for Plaintiff–Appellant.

Teresa Kinney, Assistant City Attorney, Office of City Attorney, Aurora, Colorado (Charles H. Richardson with her on the brief), for Defendant–Appellee.

Before BALDOCK, MCKAY, and EBEL, Circuit Judges.

EBEL, Circuit Judge.

This is an appeal from the district court's grant of summary judgment to the Defendant–Appellee City of Aurora ("the City") on Plaintiff–Appellant Ofelia Randle's ("Randle") claims of employment discrimination under 42 U.S.C. § 2000e–2(a)(1) ("Title VII")[1] as well as under 42 U.S.C. § 1983[2] and 42 U.S.C. § 1981.[3] In this appeal, we first review the district court's ruling that the City neither maintained a custom of discriminatory employment practices nor granted sufficient authority to the City Manager, Finance Director and the Human Resources Director (collectively "the City officials") to make them "final policymakers" so as to give rise to §§ 1981 and 1983 liability on behalf of the City. We AFFIRM the district court's ruling that there was no showing that the City maintained a custom of discriminatory employment practices, but REVERSE the district court's summary judgment ruling that the City officials were not "final policymakers" so as to impute liability to the City, and REMAND for further proceedings on this issue.

1. This section provides, in relevant part, that it shall be an unlawful employment practice:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
>
> 42 U.S.C. § 2000e–2(a)(1).

2. This statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
>
> 42 U.S.C. § 1983.

3. This statute provides, in relevant part, that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> 42 U.S.C. § 1981.

Turning to the merits of the employment discrimination claims, we consider Randle's disparate treatment claims based on the City's (1) failure to promote her; (2) failure to announce a position to which she could have applied; and (3) discrimination against her by paying a higher salary to a white co-worker with the same job title. As to these claims, we AFFIRM the district court's grant of summary judgment for the City on the failure to announce claim, but RE-VERSE the grant of summary judgment for the City on the failure to promote and wage discrimination claims. Thus, we REMAND this case for further proceedings consistent with this opinion.

## I. BACKGROUND

Randle, an Asian woman of Filipino nationality, has been employed by the City as a Liquor Licensing Administrative Assistant in the Liquor Licensing Section of the City's Finance Department since October 29, 1984. When Randle was hired by the City, she was trained by Ruby Allman, a white woman, who had been working with the City since 1983, and who, since the inception of Randle's employment with the City, has continued to be paid $5,000 more per year than Randle. By 1988, Randle had completed her training and assumed at least 90% of the job responsibilities performed by Allman. Randle began receiving as good or better job evaluations as Allman, but never received a raise to equalize her salary with Allman's salary.

In May 1989, Randle applied for a promotion to Licensing Technician III.[4] The City certified Randle as qualified for the position and interviewed her, but passed over her in favor of Beverly Gilmore, a white woman.

As a result of a May 1991 reorganization, both Allman's and Randle's job descriptions were redrafted to be made identical and both of their titles were changed to Licensing Clerk, but Allman retained her higher salary. Despite their identical job descriptions, Allman continued to perform additional respon-

sibilities outside of her job description, including preparing reports for the City Council, changing the licensing authority's rules and regulations, researching various issues and preparing the budget—which, taken together, consumed approximately ten percent of her time. Due to her concern over the wage differential between her and Allman, Randle requested an explanation from the City Manager, who referred the matter to Nancy Carney, the City's Director of Human Resources. Carney responded that the differential was based solely on the fact that Allman was hired 1.5 years before Randle and received pay raises since then that preserved the differential. However, based on the 1.5 additional years of employment, Randle claims, relying on the expert opinion of Patricia Pacey, a labor economist, that Allman only merits 6% more pay than Randle, rather than the 24% differential that presently exists and has existed between them. Pacey, however, only testified on the basis of "typical pay plans in labor economics," and the 6% figure only reflected her estimate of inflation for 1.5 years. Additionally, Randle questions the City's explanation for the differential because such a wage differential did not occur when Karen Richards was hired for a Licensing Technician III position, as Richards was paid the same salary (or slightly more) than that earned by Beverly Gilmore, who had previously held that position and enjoyed several years of seniority over Richards.

The May 1991 reorganization not only gave both Allman and Randle the same job titles, but also eliminated one of the Licensing Technician III positions and created a new Licensing and Enforcement Administrator position. This position was responsible for supervising the licensing clerks (i.e. Allman and Randle), the remaining Licensing Technician III position, and an assistant. The Finance Director, John Gross, consulted with the Human Resources Director, Nancy Carney, about how to fill this position and she told him that he need not post the vacancy because it resulted from a reorganization.

---

4. The requirements for this job were a high school diploma and an associate's degree in Business Administration with emphasis in Accounting or Finance, plus one year related expe-

rience and one year collection experience. The job posting also explained that equivalent combinations of training and experience may be considered.

Gross was wary of not announcing the position because that would deviate from the City's normal practice of announcing new positions—reflected in the Personnel Manual's requirement that all permanent positions be announced internally for a minimum of five days. However, Carney explained that Administrative Policy Memorandum ("APM") 3.4 permitted such an exception from normal practice. Gross ultimately reassigned Beverly Gilmore to this new position without a formal announcement of the opening—a decision sanctioned by Carney as well as the City Manager, John Pazour.

In September 1991, the Technician III position again became vacant, but the position now required an Associate's Degree—that is, the ability to substitute other education or experience for this degree was dropped from the job posting. Randle applied for the position, but the City refused to certify her application because she did not have an Associate's Degree. As no other internal candidates met the requirements for the position, the City hired Karen Richards, an outside applicant and a white woman, for the position. While Richards also lacked an Associate's Degree, the City viewed her two years of college as a sufficient substitute; however, when the City thereafter discovered that she had not actually completed these two years of college, it chose to allow her to remain in the position even though it had customarily fired other employees for misrepresenting material facts on their employment applications.

On January 24, 1992, Randle filed a complaint with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of race and national origin based on the City's failure to promote her in 1991 and the disparity between her compensation and Allman's. The CCRD issued its determination of no probable cause and the Colorado Civil Rights Commission subsequently denied Randle's appeal; the EEOC issued Randle's right to sue letter on October 7, 1992 and Randle filed this lawsuit two months later.

The district court granted the City's motion for summary judgment, ruling against Randle on her §§ 1981 and 1983 claims by determining that the City was not liable for the challenged actions and concluding that the City did not violate Title VII. *Randle v. City of Aurora*, No. 92–N–2528 (D.Colo. Jan. 5, 1994). The district court then dismissed her state law claim because supplemental jurisdiction was no longer warranted.[5] Randle moved to alter or amend the judgment, but the district court denied that motion in a written opinion. Randle now appeals the district court's rulings on her §§ 1981 and 1983 claims as well as on her Title VII claim.

## II. DISCUSSION

### A. *MUNICIPAL LIABILITY UNDER § 1983 AND § 1981*[6]

■ We first analyze whether the City is liable under § 1983 and § 1981 for the alleged discriminatory acts of its City Manager, Finance Director and Human Resources Director.[7] In the instant case, Randle has alleged that the City is liable for the actions

---

**5.** The district court explained that "[s]ince all of plaintiff's federal claims are dismissed, I no longer have jurisdiction over her state law claim for breach of contract." *Randle*, slip op. at 2.

**6.** The Supreme Court recently explained that "to prevail on [a] claim for damages against [a governmental entity], petitioner must show that the violation of his [or her] 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* [v. *New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)] and subsequent cases." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735–36, 109 S.Ct. 2702, 2723, 105

L.Ed.2d 598 (1989). Hence, all references to § 1983 liability with regard to the issues of custom and policy also address the question of whether the City can be held liable under § 1981.

**7.** We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c). *Universal Money Ctrs., Inc. v. AT & T*, 22 F.3d 1527, 1529 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994); *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990).

of the City officials [8] because (1) they were acting pursuant to a custom of discriminatory employment practices; or (2) the actions of these officials in setting Randle's salary and in declining to promote her were the actions of City officials with final policymaking authority.

## 1. Custom Or Usage

■ Randle's failure to allege the existence of similar discrimination as to others seriously undermines her claim that the City maintained a custom of discriminatory personnel practices. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130, 108 S.Ct. 915, 926, 927–28, 99 L.Ed.2d 107 (1988) (plurality opinion) (custom requires that the illegal practice be "widespread"—i.e., involving a "series of decisions"); *Melton v. City of Oklahoma City*, 879 F.2d 706, 725 n. 26 (10th Cir.1989) (distinguishing case from *Praprotnik* because plaintiff offered evidence that the City acted similarly against another person in addition to himself, and thus, was potentially able to demonstrate the existence of a custom), *modified on other grounds*, 928 F.2d 920, 922 (10th Cir.) (en banc) (explicitly leaving panel's judgment on § 1983 liability intact), *cert. denied*, 502 U.S. 906, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991). The Supreme Court recently reiterated that governmental entities may be held liable for a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Jett. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989) (quotation omitted). Here, based on the few incidents of discrimination alleged by Randle (which were all directed against her), we agree with the district court that Randle has failed to establish a genuine dispute of material fact about whether the City had a custom of discriminatory employment practices.

## 2. The City Officials As Final Policymakers

In *Pembaur v. City of Cincinnati*, the Supreme Court held that the search of a doctor's office without a warrant gave rise to municipal liability because the County Prosecutor was acting as a "final decisionmaker" when he ordered the illegal search. 475 U.S. 469, 484–85, 106 S.Ct. 1292, 1301, 89 L.Ed.2d 452 (1986). Justice Brennan explained that if an official, who possesses final policymaking authority in a certain area, makes a decision—even if it is specific to a particular situation—that decision constitutes municipal policy for § 1983 purposes. *Id.* at 481, 106 S.Ct. at 1299. Hence, such an act can be understood as an act "of the municipality" which the municipality "officially sanctioned or ordered." *Id.* at 480, 106 S.Ct. at 1298.

■ However, *Pembaur* left open the question of how to determine who is a "final policymaker." That question was later addressed in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).[9] First, *Praprotnik* explained that "final policymaking authority" is a legal issue to be determined by the court based on state and local law. *Id.* at 124, 108 S.Ct. at 924. *Praprotnik* then reasoned that, since the St. Louis Civil Service Commission possessed final authority on personnel decisions, *id.* at 129–30, 108 S.Ct. at 927–28, the discretionary hiring and firing decisions by subordinate employees did not constitute final policymaking by the municipality. This reasoning relied on the four touchstones of municipal liability outlined in *Pembaur*. *Id.* at 123, 108 S.Ct. at 924. First, a municipality can only be held liable for acts which the municipality itself is responsible—that is, those it has "officially sanctioned or ordered." Second, only those officials with "final policymaking authority" can subject a municipality to liability. Third, the question of whether an official has "final policymaking authority" is a question of state law. Fourth, the chal-

---

8. While Randle contends that the City Manager, Finance Director and Human Resource Director qualify as "final policymakers," the City argues that none of them so qualify, and that the City Council is the sole final policymaker in the area of personnel policy. Thus, the opinion treats all three City officials collectively and does not distinguish between them.

9. While the references to *Praprotnik* refer to Justice O'Connor's plurality opinion, that opinion can fairly be read as binding precedent because it was apparently adopted by a full majority of the Supreme Court in *Jett*, 491 U.S. at 737–38, 109 S.Ct. at 2724.

lenged conduct must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area. *Id.*

*Praprotnik* also set out the basic "conundrum" and "line drawing exercise" that lower courts face in ascertaining the existence of a municipal policy:

> If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability. If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose.

*Id.* at 126–27, 108 S.Ct. at 926. In outlining the "elegant line" drawing exercise of assigning municipal liability, Justice O'Connor highlighted two guiding inquiries: (1) whether a subordinate's discretionary decisions are constrained by general policies enacted by others; and (2) whether the subordinate's specific decisions are reviewable by others. *Id.* at 127, 108 S.Ct. at 926. This guidance largely flowed from an example offered in Justice Brennan's plurality opinion in *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Justice Brennan explained that in the case where the Board of County Commissioners established county employment policy and delegated to the County Sheriff alone the discretion to hire and fire employees pursuant to that policy, the county itself would not be liable if the Sheriff unconstitutionally exercised this authority because the "decision to act unlawfully would not be a decision of the Board." *Id.* at 483 n. 12, 106 S.Ct. at 1300 n. 12. However, if the sheriff had been delegated final responsibility for establishing employment policy—i.e., if the sheriff was not subject to any meaningful review or constraints—then the county could be held liable for his actions within the grant of his official authority. *Id.* Justice Brennan defined a

"policy" as "a course of action [consciously chosen] from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483–84, 106 S.Ct. at 1300. However, he underscored that while the quintessential policy is a governmental entity's "establish[ed] fixed plans of action to be followed under similar circumstances consistently and over time," *id.* at 480–81, 106 S.Ct. at 1299, policy can also be established pursuant to a specific and one-time decision made by a "final policymaker," *id.* at 481, 106 S.Ct. at 1299.

■ Guided by the general principles outlined above, we can identify three elements that help determine whether an individual is a "final policymaker": (1) whether the official is meaningfully constrained "by policies not of that official's own making;" (2) whether the official's decision are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority. *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926; *Ware v. Unified School Dist.,* 902 F.2d 815, 818 (10th Cir.1990) ("Delegation does not occur when a subordinate's decisions are constrained by policies not of his making or when those decisions are subject to review by the authorized policymaker.").[10]

■ In order to determine whether an individual holds "final policymaking" authority, we begin by examining the legal chain of authority. *See Jantz v. Muci,* 976 F.2d 623, 631 (10th Cir.1992) (school board not liable for school principal's actions because the school board had ultimate legal authority to review decisions involving the hiring and firing of employees); *Ware,* 902 F.2d at 819 (municipality not liable because the principal, who fired the plaintiff, was not the final policymaker on personnel matters as he was not vested with such authority and any decisions he made were reviewable by the school

---

**10.** *See also Flanagan v. Munger,* 890 F.2d 1557, 1568–69 (10th Cir.1989) (assigning § 1983 liability because the municipal code granted unconstrained authority to Police Chief to manage department and there was no established procedure to review his decisions); *Starrett v. Wadley,*

876 F.2d 808, 819 (10th Cir.1989) (explaining that county assessor was final policymaker because his personnel decisions were not made pursuant to any constraints and staff members "had no meaningful avenues of review of [the county assessor's] employment decisions").

board); *Wulf v. City of Wichita,* 883 F.2d 842, 868–69 (10th Cir.1989) (municipality not liable because the police chief who fired plaintiff was not the final policymaker of the city's personnel policy nor was the police chief's decision and the basis for it ratified by the city manager who had the legal authority to hire and fire employees). Nevertheless, our decisions also underscore that any review procedure or constraints must be *meaningful*—as opposed to merely hypothetical—in order to strip an official of "final policymaking" authority. *See Melton,* 879 F.2d at 724 n. 24 (although not explicitly addressing its significance, charter provision that all personnel decisions were to be made solely based upon "merit and fitness" did not immunize City from liability based upon City Manager's personnel decision); *Flanagan v. Munger,* 890 F.2d 1557, 1569 (10th Cir.1989) ("[F]or all intents and purposes the Chief's discipline decisions are final, and any meaningful administrative review [by the City Council or City Manager] is illusory."); *Starrett v. Wadley,* 876 F.2d 808, 818–19 (10th Cir.1989) ("Wadley had final authority to set employment policy as to the hiring and firing of his staff" because City did not offer any "meaningful avenues of review").

■ Applying the proper legal standard for determining whether an official is a final policymaker to the circumstances of the instant case, we conclude that the record before us contains disputes of material fact which preclude a grant of summary judgment for the City. Thus, we remand this case for further proceedings.

Randle contends that summary judgment was improper because there was significant evidence suggesting that the City officials were final policymakers. Specifically, Randle points to Charter provisions that (1) grant the City Manager full authority over personnel policies (albeit subject to any personnel regulations that may be adopted by the City Council); and (2) prevent the City Council from any involvement in employment decisions. The City Charter provides that

> The city manager shall be responsible to the council for the proper administration of all affairs of the city placed in his charge,

and to that end he shall have the power and duty to:

. . . . .

> (b) Appoint, suspend, transfer and removal of all employees of the city, except as otherwise provided herein, subject to the personnel regulations of the city adopted by the council.

Charter of City of Aurora § 7–4 (Nov. 3, 1987) [hereinafter "City Charter"]. The City of Aurora Personnel Policy and Procedures Manual (June, 1989) [hereinafter "Manual"] also provides that:

> The City Manager is responsible for the employment of personnel other than appointees of the City Council, for proposing and administering these Policies and Procedures, for keeping the City Council advised of personnel matters and for the overall effectiveness of the personnel management program.

Manual at 3. The Manual also sets forth the authority of the department directors (such as Gross and Carney) as follows: "Department Directors are responsible for appointment, promotion, transfer, or separation of employees and for managing employees in accordance with these Policies and Procedures." Manual at 4.

By contrast, the City relies on the following provision of the City Charter to support its position:

> The council shall provide for a comprehensive public employment system for all full time regular employees of the city except the heads of departments. The system shall provide for a classification of all employments in the public service, as specified herein; open and competitive examinations and/or interviews to determine qualifications for employment; employment and promotions based upon merit, experience and record of service; establishment of pay scales; and such other matters as the council may deem proper.

City Charter § 3–13. However, even though the City Charter mandates that the Council pass such regulations, the absence of any mention of such regulations in the City's brief or evidence of them in the record prevents us from considering whether the Coun-

cil has, in fact, enacted such regulations or whether they provide a meaningful constraint on the City Officials' employment decisions as to Randle. Moreover, there is nothing in this record to suggest that the City Council in fact involved itself in the terms and conditions of Randle's employment or the hiring and promotion decisions which affected her.[11] The Manual also states that:

> The City Council shall be the ultimate policy making authority for the City of Aurora in matters pertaining to personnel administration. No changes in the compensation plan, fringe benefits, or Personnel Policies shall be effective unless submitted to and approved formally by the City Council.

Manual at 3.

Perhaps most significantly, the City Charter precludes the City Council from reviewing the City Manager's (or any other city official's) personnel decisions regarding employees, such as Randle, who not are Council appointees:

> Neither the council nor any of its committees or members shall direct or request the appointment of any person to, or his removal from, employment by city manager, or in any manner take part in the appointment or removal of employees in the administrative service of the city, except as otherwise provided in this Charter. The council and its members shall deal with that portion of the administrative service for which the city manager is responsible solely through the manager, and neither the council nor any member thereof shall give orders to any employee of the city either publicly or privately.

City Charter § 3–10 (Powers Withheld From Council).[12]

Based on the record before us, we conclude that a genuine dispute remains as to whether the City officials exercise final policymaking authority in the area of personnel matters. Accordingly, we reverse the district court's grant of the City's motion for summary judgment and remand the issue of whether the City officials are final policymakers on personnel matters for further proceedings consistent with this opinion.

## B. *EMPLOYMENT DISCRIMINATION CLAIMS*

If the City officials are final policymakers in the area of personnel policy (i.e. are authorized to make final employment decisions as to wages, promotions, hiring and termination), the City can be held liable for any impermissible employment decisions under §§ 1981 and 1983 pursuant to the *McDonnell Douglas* framework originally developed to determine the existence of intentional discrimination in violation of Title VII. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989) (adopting *McDonnell Douglas* framework for § 1981); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991) ("[T]he elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in *McDonnell Douglas*, whether that case is brought under §§ 1981 or 1983 or Title VII."); *see also St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, —— n. 1, 113 S.Ct. 2742, 2746 n. 1, 125 L.Ed.2d 407 (1993) (assuming that *McDonnell Douglas* framework applies to § 1983 actions). Furthermore, even if the district court determines that the City officials do not make personnel policy for the City so as to give rise to §§ 1981 and 1983 liability, the City still is an employer for Title VII purposes and can be sued on that ground alone. *Crowley v. Prince George's Cty.*, 890 F.2d 683, 687 (4th Cir.1989); *Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir.1986). Thus,

---

**11.** The possible existence of any meaningful constraints on personnel policy is cast into doubt by the fact that Administrative Policy Memorandum 3.4, presented as governing personnel policy and relied on by the City in defending the failure to announce claim discussed in Part II.B.2.b. *infra,* was authorized and signed only by the City Manager—the same official the City claims lacks final policymaking authority.

**12.** The City countered at oral argument that the Career Service Commission has the power to review personnel decisions and that strips the City officials of final policymaking authority. We reject this argument at this stage of the proceedings because this alleged role of the Career Service Commission is neither mentioned in the City's brief nor supported in the record before us.

we need to address the substance of Randle's claim that the City wrongfully discriminated against her in her terms and conditions of employment.

### 1. The *McDonnell Douglas* standard

 In the context of employment discrimination cases analyzed pursuant to the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination.[13] Once this is done, the employer must offer a facially nondiscriminatory reason for its employment decision. *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. at 1824; *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1317–19 (10th Cir.1992). At the summary judgment stage, it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e. unworthy of belief. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir.1994). If the plaintiff succeeds in showing a prima facie case and presents evidence that the defendant's proffered reason for the employment decision was pretextual—i.e. unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial.[14]

 The City argues that there is still one more hurdle that the plaintiff must over-come to escape summary judgment; it is the City's position that in addition to a prima facie case and a showing of pretext, the plaintiff must come forward with some direct evidence that the City was motivated by an illegal discriminatory animus or summary judgment may be entered against the plaintiff. We disagree.

 The defendant fails to appreciate that the Supreme Court has said that discriminatory animus *may be inferred* from the simple showing of pretext. Thus, a showing of pretext *is* evidence which allows a jury to infer discriminatory intent. Consequently, because a jury may find illegal discrimination upon nothing more than a prima facie case and pretext, such a showing at the summary judgment stage is sufficient to get the case to the jury.[15] This conclusion flows directly from the Supreme Court's analysis in *St. Mary's Honor Ctr.*, where the Court observed that "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Id.*, —— U.S. at ——, 113 S.Ct. at 2749. The Supreme Court had issued a similar ruling earlier in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) when it said that a plaintiff may satisfy her "ultimate burden of persuading the court that she has been a victim of intentional discrimination

---

**13.** This framework requires that a plaintiff first establish a prima facie case of employment discrimination by proving that: (1) the plaintiff is a member of a protected class; (2) the plaintiff applied for and was qualified for an available position; (3) the plaintiff was rejected despite being qualified; and (4) the position remained open as the employer continued to search for applications or the position was filled by a person not of the protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The prima facie case is a flexible standard that may be modified to relate to different factual situations. *Mohammed v. Callaway*, 698 F.2d 395, 398 (10th Cir.1983).

**14.** Of course, in the unlikely event that the plaintiff concedes that the real, albeit concealed, reason for the employment decision was a motive that itself is not prohibited under the civil rights laws, the plaintiff would remain vulnerable to summary judgment because the plaintiff's concession of a lawful motive would take the issue of motive from the jury and preclude the inference

of a discriminatory motive that the jury could otherwise draw from the fact of pretext. For example, if a defendant stated that the plaintiff was fired for unexcused absences and the plaintiff offered evidence that reason was pretextual and contended instead that he or she was really fired because the boss wanted to make that job available to his or her spouse, the defendant would be entitled to summary judgment because of plaintiff's concession that the true reason was not a prohibited discriminatory reason, even if it was concealed. The defendant would also be entitled to summary judgment if plaintiff could not offer evidence tending to show the defendant's innocent explanation for his employment decision was false. However, this situation is inapplicable to the instant case.

**15.** The jury is not *required* to find discriminatory animus from pretext, but it is simply regarded as inferential evidence of discrimination from which the jury *may* make such a finding. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir. 1994); *E.E.O.C. v. Flasher Company*, 986 F.2d 1312, 1320–21 (10th Cir.1994).

... by showing that an employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. Although both *St. Mary's Honor Ctr.* and *Burdine* addressed a plaintiff's burden at trial, those rulings have *a fortiori* applicability to plaintiff's burden at the summary judgment stage because if this inferential evidence is sufficient to allow a plaintiff to prevail at trial, it is surely sufficient to permit a plaintiff to avoid summary judgment so that the plaintiff can get to trial.

The Tenth Circuit has, on several occasions, explicitly reached the same conclusion.[16] In *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1379–81 (10th Cir.1994), we held that it was error for the district court to grant summary judgment to the defendant when the plaintiff had established a prima facie case and had presented evidence that the facially nondiscriminatory reasons proffered by the defendant were pretextual. Although there the plaintiff had presented no evidence other than pretext to show that the defendant acted with an illegal discriminatory motive, we concluded that disbelief of the defendant's articulated reasons for its actions, together with a prima facie case, can establish unlawful discrimination). *Id.* at

1379–81. *See also Durham v. Xerox Corp.*, 18 F.3d 836, 839–40 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994), where we said,

> "Although a prima facie case combined with disproof of the employer's explanations does not prove intentional discrimination as a matter of law, it may permit the factfinder to infer intentional discrimination, and thus preclude summary judgment for the employer.... 'The factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination' [quoting *St. Mary's Honor Ctr.*].... 'The district court erroneously thought that respondent was required to submit direct evidence of discriminatory intent....' [citing *Burdine* ]"

*Ingels v. Thiokol Corp.*, 42 F.3d 616, 622, n. 3 (10th Cir.1994) ("Pretext *may* support a factual conclusion of discrimination.... Thus, establishing pretext gets a plaintiff over the hurdle of summary judgment against it.... [T]he ultimate questions resides with the trier of fact.") [17]

---

**16.** This approach has also been adopted by most of the other circuits. *See E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.1994) ("A finding of pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and thus permits the ultimate inference of discrimination."); *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994) ("a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by ... discrediting the proffered reasons, either circumstantially or directly"); *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir.1993) (employee can withstand summary judgment by creating a factual dispute about the veracity of the employer's proffered reason for the challenged decision); *Anderson v. Baxter*, 13 F.3d 1120, 1123–24 (7th Cir.1994) (explaining that *St. Mary's* adopted the approach that a plaintiff can withstand a motion for summary judgment by " 'produc[ing] evidence from which a rational factfinder could infer that the company lied' ") (quotation omitted); *Gaworski v. ITT Commercial Finance Corp.*, 17 F.3d 1104, 1110 (8th Cir.) (combination of prima facie case and disproof of employer's proffered reason allows jury to find intentional discrimination), *cert. denied*, —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994); *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir.1993) ("If a plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's

stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed."); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919–21 (11th Cir.1993) (noting the need to allow discrimination to be proved through circumstantial evidence, and concluding that "Appellant has provided a sufficient factual basis in the record upon which a reasonable trier of fact may find that the stated reasons for the adverse employment actions were mere pretext."); *Barbour v. Merrill*, 48 F.3d 1270, 1277 (D.C.Cir.1995) ("Because Barbour introduced sufficient evidence that he had proven a prima facie case of discrimination and that Medlantic's proffered reasons were pretextual, the jury could have reasonably concluded that Barbour had proven unlawful discrimination."). *But see Rhodes v. Guiberson Oil Tools*, 39 F.3d 537, 545 (5th Cir.1994) (requiring direct evidence of discrimination to withstand summary judgment).

**17.** Admittedly, the Tenth Circuit's language on this issue has not always been clear. Compare *Durham v. Xerox Corp.*, 18 F.3d at 839–40 ("Although a prima facie case combined with disproof of the employer's explanations does not prove intentional discrimination as a matter of law, it may permit the factfinder to infer intentional discrimination, and thus preclude summary judgment for the employer.") with *Jones v.*

■ It is not the purpose of a motion for summary judgment to force the judge to conduct a "mini trial" to determine the defendant's true state of mind. So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about intent are best left for trial and are within the province of the jury. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("at the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial"); *Brown v. Parker–Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir.1984) ("where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment.") (citing *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1309 (10th Cir.1980) (questions of motive and intent are "particularly inappropriate for summary judgment disposition"); *see also Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993) ("If the plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed.").

■ If the plaintiff establishes a prima facie case and shows either that defendant's facially nondiscriminatory reasons are pretextual or otherwise introduces direct evidence of illegal discriminatory motive, the case then moves to trial, where the presumption of discrimination created by the prima facie showing "simply drops out of the picture." *St. Mary's Honor Ctr.,* —— U.S. at ——, 113 S.Ct. at 2749. At trial, the plaintiff must prove illegal discrimination either (1) *inferentially* by showing that the proffered reason is a pretext *for discrimination;* [18] and/or (2) *directly* by offering direct evidence of discrimination. *Ingels,* 42 F.3d at 621.

### 2. Randle's Employment Discrimination Claims [19]

#### a. The failure to promote claim

■ Randle's failure to promote claim involves the questions of whether there is a disputed issue of material fact on: (1) whether Randle was qualified for the Technician III position; and (2) whether the City's proffered reason for not hiring Randle for this position was pretextual. We conclude that there is a disputed issue of fact on each question so as to preclude a grant of summary judgment on Randle's failure to promote claim.

The district court concluded that Randle was not qualified for the Technician III position because she "has no college credit whatsoever." *Randle,* slip. op. at 15–16. However, as Randle points out, this fact may not disqualify her for the position if the requirement of college training was not a genuine prerequisite for the position. Randle high-

---

*Babbitt,* 52 F.3d 279, 281 (10th Cir.1995) ("Because defendant met his burden, plaintiff then was required to show that defendant's reason was merely a pretext for unlawful reprisal and that defendant intentionally discriminated against plaintiff because of his claim."). "[T]o secure or maintain uniformity of [our] decisions," Fed.R.App.P. 35(a), the en banc court has unanimously adopted this panel's holding that a civil rights plaintiff may withstand a motion for summary judgment and is entitled to present his claim to the factfinder if the plaintiff establishes a prima facie case and presents evidence that the defendant's proffered nondiscriminatory reason was pretextual—i.e., unworthy of belief. All of our cases, or parts of cases, inconsistent with the rule announced herein are overruled.

18. *At trial,* the plaintiff must convince the jury not only that the reason proffered by the defendant was pretextual, but that the jury should infer that the defendant's pretext concealed a motive of discriminating against the plaintiff in violation of the civil rights laws. It is this last inference which must be established at trial, but which is not required to be found by the judge at the summary judgment stage because drawing that ultimate inference from the evidence is within the province of the jury.

19. We note that Randle's failure to promote claim arises under pre–1991 Civil Rights Act law, but her wage discrimination claim covers time after the enactment of the new act as well as time covered under pre–1991 law.

454

lights the fact that the City retained Richards in this position even when it discovered that she did not meet the stated requirement of having an associate's degree; in any event, the City previously posted an announcement of this position with the explanation that other experience could substitute for this qualification and the City certified Randle's application on that ground. Based on these facts, Randle has established a genuine issue of fact as to whether she was qualified to be hired as a Technician III and as to whether the City's claim that she was not qualified was pretextual and untruthful. *See Drake v. City of Fort Collins,* 927 F.2d 1156, 1160 (10th Cir.1991) (explaining that plaintiff established a prima facie case even though he did not meet a two year college requirement because the City certified others who also did not meet this requirement).

The City also contends that it hired the most qualified applicant. However, Randle's evidence of pretext and the City's failure to fire Richards after it discovered her misrepresentation as to her qualifications enable Randle to withstand summary judgment. At trial, of course, Randle will bear the burden of *proving*—without the benefit of any presumptions—that the City's decision not to promote her resulted from illegal discrimination. Thus, we reverse the district court's grant of summary judgment to the City on Randle's failure to promote claim.

**b. The failure to announce the Administrator's position**

 It is undisputed that the City did not announce the opening of the Administrator's position even though the City's practice, as reflected in Section 1–2 of its Personnel Manual, was that "permanent positions shall be announced internally." Aplt.App. at 308. The City justified its failure to announce the opening of the Administrator position—which

precluded Randle from applying for and potentially receiving a promotion to the position—based upon APM 3.4, which states that "employees may be reassigned with[in] a department at the discretion of the department directors," Aplt.App. at 150, and Nancy Carney's interpretation of that provision as it applied to the Administrator position. Randle argues that to the extent that permanent reassignments can be made pursuant to this provision, they must be positions of the same skill level because Section 1–4 of the Personnel Manual provides that a "change from one position to another position within a Department where there is no change in skill level is at the discretion of the Department Director." Aplt.App. at 310. While that may be the most obvious interpretation of this provision, the district court concluded that Carney's interpretation of APM 3.4 was not "so unreasonable" as to defy credulity. *Randle,* slip. op. at 19.

 The mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual. *Ingels,* 42 F.3d at 623 ("To the extent there is any inconsistency at all [in following the employer's internal procedures], it only goes to *process* and not to purpose or motivation, and could not provide a sufficient basis for a jury to find pretext for age discrimination."). Here, the City is not offering its procedures as a *reason* for its ultimate decision to promote Gilmore, rather than Randle, to the Administrator's position.[20] The City apparently promoted Gilmore because she was the most qualified candidate for the position and Randle has offered no evidence suggesting that this reason was pretextual—i.e., that she was more

---

20. The authority cited by Randle in support of the proposition that procedural irregularities can suggest the existence of illegal discrimination all involved cases where the disregarded procedures directly and uniquely disadvantaged a minority employee. *See Mohammed,* 698 F.2d at 400–01 (departure from criteria set out in job announcement so as to disadvantage a Hispanic applicant was probative of discrimination); *Lucy v. Manville Sales Corp.,* 674 F.Supp. 1426, 1427

(D.Colo.1987) (contrary to company policy, qualified black employee not interviewed even though other qualified white employees were interviewed was evidence of pretext). In the instant case, the alleged procedural irregularity disadvantaged all potential applicants, and thus, in and of itself, does not suggest either that the defendant's proffered reasons for its employment decisions were pretextual or that the defendant was motivated by illegal discrimination.

qualified for the position. Thus, Randle has failed to show how the City discriminated against her by allegedly failing to follow its own posting procedures.

In any event, the City offered evidence that it believed that it was following its own internal procedures, and thus, even if the failure to announce this position was a mistake, it was not pretextual. That is, just because the reasoning relied upon for a certain action is mistaken does not mean that the reason is pretextual. Thus, we affirm the district court's grant of summary judgment to the City on this claim.

#### c. The wage discrimination claim

■ The district court accepted the City's explanations that Allman's seniority and additional responsibilities explained the 24% pay differential between them and granted the City's motion for summary judgment on Randle's wage discrimination claim. Moreover, the district court ruled further that Randle did not offer any evidence that this reason was pretextual. Randle argues that she set out four such reasons: (1) an expert opined that the seniority differential only accounts for 6% of the differential if one looked just at the inflation factor which was utilized in some labor pay plans; (2) the City and Allman acknowledged that Randle shares 90% of the responsibilities assumed by Allman; (3) Randle and Allman share the identical job title; and (4) other white employees (i.e., the newly hired Richards and the more senior, Gilmore) were not subject to such disparities upon assuming a new position. Moreover, Randle points out that Carney initially explained that the pay differential was due entirely to Allman's seniority (the only reason for pay differential is the fact that Allman was employed for City for a year and a half longer than Randle), and now the City suggests that the differential also results from different job responsibilities—a shifting of explanations which Randle claims adds force to her pretext argument.

■ In addition to asserting its proffered non-discriminatory reasons for the wage differential, the City again argues that the:

> burden falls on Randle to show that racial
> discrimination actually motivated the City.

*Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir.) [, *cert. denied*, [—— U.S. ——] 115 S.Ct. 80 [130 L.Ed.2d 33] (1994) ]. Despite having ample opportunity, Randle has failed to do so. She can point to no comments on her race or her national origin during her employment, nor can she point to any other [direct] evidence....

Br. of Aplee at 23. While it is undeniably true that at trial Randle must prove intentional race discrimination, she can do so with either direct or inferential proof. As we pointed out previously, at the summary judgment stage, Randle can establish a sufficient possible inference of discriminatory intent by demonstrating that there is a genuine dispute as to whether the reasons offered for the challenged employment decision were pretextual—e.g. that they were not the true motivating reasons defendant professed them to be. We conclude that Randle's four arguments and the evidence supporting them cast sufficient doubt on the City's proffered reasons for the wage differential so as to allow a reasonable jury to find that these explanations were pretextual—and thus, a reasonable jury might ultimately infer that these explanations were a pretext for racial discrimination. Thus, we reverse the district court's grant of summary judgment to the City on Randle's wage discrimination claim.

### III. CONCLUSION

With respect to the issue of the City's liable under §§ 1981 and 1983, we AFFIRM the district court's ruling that there is no evidence showing that the City maintained a custom of discriminatory personnel decisions, but REVERSE the district court's determination that the City officials are not final policymakers whose actions can give rise to §§ 1981 and 1983 liability and we REMAND that issue for further proceedings. As to Randle's Title VII (and possible §§ 1981 and 1983) claims, we AFFIRM the district court's grant of the City's motion for summary judgment on Randle's claim of failure to announce the Administrator's position, but we REVERSE the district court's grant of summary judgment for the City on Randle's failure to promote and wage discrimination claims and REMAND those issues for trial.

Thus, we AFFIRM in part, REVERSE in part, and REMAND this case to the district court for further proceedings consistent with this opinion.