**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 15, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ANDREW VILLALPANDO,

        Plaintiff-Appellant,

v.

KEN SALAZAR, Secretary,
U.S. Department of the Interior,

        Defendant-Appellee.

No. 10-4086
(D.C. No. 1:08-CV-00027-CW)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Judge, **MURPHY** and **HARTZ**, Circuit Judges.

---

While employed as an instructor by the United States Bureau of

Reclamation (Bureau), a division of the United States Department of the Interior

(Department), Andrew Villalpando applied for a vacant supervisory position with

the Bureau.  A Caucasian male candidate, Matt Nielsen, was selected to fill the

position instead of Villalpando.  Villalpando then brought this action, alleging

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel.  It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

that the Department had unlawfully discriminated against him based on his race (Mexican-American) and his national origin (Hispanic).[1] The district court determined that no reasonable jury could conclude the Department's actions were based on Villalpando's race or national origin. It therefore granted summary judgment to the Department. Villalpando appeals, and we affirm.

## BACKGROUND

### 1. Villalpando's Background and Qualifications

Villalpando served in the United States Air Force for 21 years. He was posted to various locations overseas, participated in the first Gulf War, and retired in May 1991. During his military career he specialized in construction planning, management and production.

In June 1991 he began part-time employment as a laborer with the Weber Basin Job Corps Center (Weber Basin), a facility operated by the Bureau. By December 2003, he had advanced at Weber Basin to a position as Lead Facilities Maintenance Instructor. His instructor position included significant management responsibilities, requiring him, among other duties, to assist Weber Basin's Career Development Team with student placement and to manage Weber Basin's maintenance budget.

---

[1]     Villalpando's complaint also included an age discrimination claim, but he later abandoned that claim and it is not part of this appeal.

## 2.  The WPO Position Opening

Until he retired in January 2007, Dale Giauque served as Weber Basin's Work Programs Officer (WPO), a GS-11 position.  As WPO, Giauque was Villalpando's first-level supervisor.

During 2006, the Bureau's Human Resources Department (HR) prepared a revised and updated position description for the WPO position.  The revised position description was accompanied by a "Right Person Profile" (RPP) that identified "the conditions of employment, job requirements, and job competencies, including the employee's required knowledge, skills, abilities, experience, and attitudes" for the WPO position.  Aplt. App., Vol. II at 497.

The RPP and the revised position description emphasized a different set of skills than those previously associated with the position.  The previous position description, under which Giauque had served, had stressed hands-on familiarity with skills of the construction trade.  The new position description and RPP placed an enhanced emphasis on management and administration skills, particularly involving use of computer information and the software system used by the Job Corps centers.

After Giauque retired, the Bureau solicited applications to replace him in the WPO position.  Villalpando was one of the applicants.  The applications received were forwarded to the Bureau's HR office, where an HR employee rated and ranked the applicants.

### 3. Nielsen's Background and Qualifications

Among the other candidates for the position was Matt Nielsen, a male Caucasian who, like Villalpando, reported to Giauque during Giauque's tenure as WPO. Nielsen's background was in culinary arts and food service. During high school, he worked as a cook at a hospital. He was later promoted to banquet chef where he oversaw other employees and helped prepare banquets for doctors.

Nielsen later completed a culinary arts program at a technical college and worked as an executive chef at an officer's club. He eventually received his chef's certificate. When the base where he worked closed, he obtained a position as food service manager supervisor at Clearfield Job Corps. In 1997 he began work as a cook training instructor (GS-7) at Weber Basin. He was then promoted to culinary arts instructor (GS-9), a position he retained until he was selected as Weber Basin's WPO.

Before he applied for the WPO position at Weber Basin, Nielsen applied for two supervisory GS-11 positions and failed to get them. In one case, he did not even obtain an interview. He did better, however, after Archer gave him several collateral duty assignments involving additional supervisory duties at Weber Basin that enhanced his qualifications.

After completing these assignments, he applied for a WPO position at the Department's Columbia Basin facility. This time, he was selected to fill the

position, but withdrew his application for family reasons. He later successfully applied for and received the position at issue in this appeal.

### 4. The Cert List

As ranked by HR, the five finalists' scores for the Weber Basin WPO position ranged between 34 and 39. Villalpando's score was 38. Nielsen's was 37.

The HR Office provided the names of all the finalists for the position in the form of a certification list (cert list) to the selecting official, Weber Basin's Center Director, Robert Archer. On the cert list, the names were listed in alphabetical order and no scores were indicated. Archer also received each finalist's application resume, which included a written evaluation completed by his or her first-level supervisor. Giauque, who had supervised both Villalpando and Nielsen, rated Nielsen more highly than Villalpando in his written evaluations.

### 5. Archer's Pre-Interview Meeting with the Candidates

On January 18, 2007, Archer held a short meeting with the five candidates for the WPO position. Villalpando testified that during this meeting, Archer stated "whenever I make selections, I have people causing waves, getting mad, doing things because they don't like who we select. But this time if it happens I will be the person to deal with and I will discipline those people." *Id.*, Vol. I at 168. Villalpando stated that when he said this, Archer looked directly at him and

at Pam Livingston-Lewis, the other Hispanic candidate for the position. For her part, Ms. Livingston-Lewis remembered Archer saying that "he was going to pick who he felt was the best for the job" and the other candidates wouldn't want to be in the position of expressing problems with his choice or "stirring the pot, more or less." *Id.* at 99.

### 6. The Interview Process

Archer assembled a three-person panel to interview the five candidates. Since the WPO position was rated GS-11, he sought interviewers at that level or higher. The panel he assembled consisted of himself, as GS-13 Center Director; Tammy Wentland, the GS-11 Center Administrative Officer; and Susan Singleton-Wilburn, the GS-11 Center Health and Wellness Officer. Each of the panel members understood that he or she had unfettered discretion to select any of the five candidates to fill the WPO position.

Archer asked Wentland and Wilburn to come up with a list of questions to ask the candidates. Archer did not instruct the panel on what questions they were to ask, but the three panelists did meet to coordinate their questions to avoid duplication. During the interviews, the panel asked each of the five candidates the same questions. At the end of each interview, Archer asked each candidate to

prepare a written report stating what he or she would do if selected during his or her initial time in the position.[2]

Following the conclusion of the panel interviews, Archer immediately asked the panelists which of the candidates they would select if they had to make a choice at that point. Both Wentland and Wilburn chose Nielsen, as did Archer. Based on this vote, Nielsen was selected to fill the position.

Archer later explained that in his view, Nielsen's understanding of computers, software programs, and how to interface with the business community was "just a little better" than that of the other candidates. *Id.* at 89. Wilburn noted Nielsen's enthusiasm about the position during the interview, stating "he was jumping out of the chair." *Id.*, Vol. II at 339. Her previous work with Nielsen also gave her confidence in his ability to manage people. *Id.* at 340. Wentland was swayed in favor of Nielsen by his "administrative capabilities" and his computer literacy. *Id.*, Vol. I at 211.

---

[2] There is a conflict in the evidence concerning the exact nature of this "homework" assignment. Villalpando testified that he was asked to write down all the questions asked during the interview and his answers to them, then prepare a "60-day plan" for the position. Aplt. App., Vol. II at 273. Tammy Wentland remembered that the assignment "was to determine what they would do in the first 30 days of the position. And I think there was another portion, but I can't recall what that was." *Id.*, Vol. I at 212. Any discrepancies on this point do not rise to the level of a material fact dispute that would prevent the entry of summary judgment.

The candidates later turned in their written reports. The panel members reviewed these, and found that their consensus in favor of Nielsen had not changed. Accordingly, Nielsen was selected for the position.

## ANALYSIS

### 1. Summary Judgment Standard

"We review the grant of summary judgment de novo, applying the same standard as the district court . . . ." *Gwinn v. Awmiller*, 354 F.3d 1211, 1215 (10th Cir. 2004). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the record on summary judgment in the light most favorable to the nonmoving party. *Gwinn*, 354 F.3d at 1215.

### 2. *McDonnell Douglas* Standard

Villalpando asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII). Because he presents only circumstantial evidence of discrimination in support of his Title VII claims, we analyze this evidence using the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* approach, the plaintiff must first establish a prima facie case of discrimination. *Johnson v. Weld County*, 594 F.3d 1202, 1210-11 (10th Cir. 2010). In response, "the defendant then must articulate a

legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 1211. At that point, "the burden then shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination." *Id.*

The parties do not dispute that the first two steps of the framework have been satisfied. In response to Villalpando's prima facie case of discrimination, the Department offered the following legitimate and non-discriminatory reasons for not selecting him for the WPO position:

> [1] Each member of a three-person selection committee interviewed all of the final candidates, assessed the candidates' written reports, and independently and unanimously chose Mr. Nielsen as the most qualified and best suited for the newly-defined WPO position. [2] Mr. Nielsen's selection for a WPO position at another Job Corps center before the selection at issue here establishes that he was qualified for the position. [3] In addition, Mr. Giauque supervised both Mr. Nielsen and Mr. Villalpando and rated Mr. Nielsen more favorably for the WPO position.

Aplee. Br. at 13. Villalpando acknowledges that the Department met its burden by advancing these three legitimate reasons for its actions. He argues, however, that he has also met his burden of showing that these reasons were a pretext for discrimination, thereby preventing the entry of summary judgment against him.

### 3. Pretext Analysis

A Title VII plaintiff establishes pretext by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) (quotation omitted). Villalpando identifies three basic categories of pretext: (1) Archer's preferential treatment of Nielsen prior to the interview process; (2) alleged irregularities associated with the interview process; and (3) evidence of Archer's animosity toward Villalpando.

### A. Personal Favoritism

Essentially, Villalpando argues that Archer personally favored Nielsen for the WPO job. To ensure his selection, he burnished Nielsen's credentials for the job by assigning Nielsen to certain "collateral assignments" involving additional supervisory experience that made Nielsen a better candidate than he would otherwise have been. This permitted Nielsen to overcome the weakness in his credentials created by his background in food service rather than in the construction field, traditionally the heartland of Weber Basin's mission. Villalpando also alleges that during the interview process, Archer bypassed some of the usual formalities designed to insulate the interview panel against personal favoritism, short-cut the interview process, and otherwise essentially "stacked the deck" in favor of Nielsen.

All this, however, does not show pretext. Even if these arguments undermine the Department's stated reasons for promoting Nielsen rather than

Villalpando, they tend to show that the stated reasons were a pretext for Archer's *favoritism or cronyism*, not for discrimination. Villalpando concedes that *all* candidates for the position, including other Caucasian, non-Hispanic candidates, were disadvantaged by Archer's desire to see Nielsen get the job and by his actions in favor of Nielsen. *See, e.g.,* Aplt. Opening Br. at 19 ("Villalpando acknowledges that Mr. Archer's management actions evidenced favoritism toward Mr. Nielsen and that this bias impacted adversely each of the other four candidates who reached the certification roster for the WPO position."). Moreover, even if Villalpando was better-qualified than these other unsuccessful candidates, this does not erase his concession of a non-discriminatory motive.

Villalpando argues, however, that he is "not required to show pretext coupled with additional evidence of discriminatory motive to survive summary judgment." *Id.* at 28. We agree that an employee can usually survive summary judgment merely by making out a prima facie case and establishing that the employer's stated reasons are pretextual, without the need to provide further evidence of discriminatory motive. But an exception arises where "the plaintiff concedes that the real, albeit concealed, reason for the employment decision was a motive that itself is not prohibited under the civil rights laws." *Randle v. City of Aurora*, 69 F.3d 441, 451 n.14 (10th Cir. 1995). In that case, "the plaintiff would remain vulnerable to summary judgment because the plaintiff's concession of a lawful motive would take the issue of motive from the jury and preclude the

-11-

inference of a discriminatory motive that the jury could otherwise draw from the fact of pretext." *Id.*

Here, Villalpando makes precisely such a concession when he argues that the "real" reason for the employer's decision was Archer's unjustifiable favoritism of Nielsen over all other candidates. Title VII prohibits discrimination based on race or national origin, but not based on personal favoritism. *See Neal v. Roche*, 349 F.3d 1246, 1251-52 (10th Cir. 2003). While "racism can be said to be a particular kind of cronyism or favoritism" and courts must be careful "not to condone a defense that would immunize racial discrimination by giving it a different name," *Harris v. Hays*, 452 F.3d 714, 721 (8th Cir. 2006) (Gibson, J., concurring), those concerns are not implicated here.

Villalpando's naked protestations that discrimination was involved cannot save his claim. A plaintiff who advances a hidden but nondiscriminatory motivation need not "concede that [the] nondiscriminatory motive was the *only* motivation for the employer's actions in order to justify summary judgment for the employer." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1173 (10th Cir. 2007). Rather, it is sufficient that he "provided arguments in [his] summary judgment materials as a part of [his] position before the court that supported such a nondiscriminatory motive," and that his "other evidence was insufficient to permit an inference of any discriminatory motive." *Id.* As we have seen, Villalpando's arguments do support a nondiscriminatory motive.

Accordingly, we turn next to the "other evidence" he provided, concerning Archer's alleged animosity toward him, to determine whether this evidence permits the inference of a discriminatory motive.

### B. Animosity

Villalpando asserts that Archer's animosity toward him explains his failure to offer Villalpando the same training and collateral opportunities he offered Nielsen, as well as his failure to hire him for the position. A concession that Archer was motivated by personal animosity rather than discriminatory animus would of course justify the entry of summary judgment on Villalpando's Title VII claim, for the same reasons we have outlined involving favoritism. *See Randle*, 69 F.3d at 451 n.14. *Personal* animosity is merely the flipside of favoritism. Giving Villalpando the benefit of the doubt, however, we will assume he alleges not merely personal animosity but an animosity equivalent to discriminatory animus because of Villalpando's race and national origin. Even so, he fails to present evidence that would satisfy his burden of showing pretext on this basis.

First, he admits that Archer had poor working relationships with three of the unsuccessful candidates, not only himself. As the district court put it, "sufficient evidence has been presented to show that Robert A. Archer has an authoritarian supervisory style that may result in animus toward employees who challenge Mr. Archer's opinions or decisions." Aplt. App., Vol. I at 30. This evidence merely suggests animus of the equal-opportunity variety.

Second, the only two specific incidents illustrating animosity that he describes are an incident when Archer failed to award him and another Hispanic employee their 15-year service pins during a meeting, and the fact that Archer looked directly at the two Hispanic candidates when he warned the candidates for the WPO position about making waves if they were not the successful candidate for the position. These two isolated incidents, standing alone, are insufficient to demonstrate that the Department's actions in selecting Nielsen were pretextual.[3]

The judgment of the district court is AFFIRMED.

Entered for the Court


Michael R. Murphy
Circuit Judge

---

[3] We also note that in 2004, Villalpando served in the collateral duty role of safety officer for less than a year before Archer removed him and appointed Nielsen safety officer instead. But this hardly establishes discriminatory animus. Villalpando does not deny Archer had a non-discriminatory motive for replacing him with Nielsen: Villalpando's heavy workload at the time. Aplt. App., Vol. I at 151.