Maxine I. DUNBAR, Plaintiff,

v.

The **BOARD OF DIRECTORS OF THE LEAVENWORTH PUBLIC LIBRARY,** Defendant.

No. Civ.A. 97–2210–KHV.

United States District Court,
D. Kansas.

June 30, 1998.

Michael J. Joshi, Borel & Associates, Kansas City, MO, for Maxine I. Dunbar, plaintiff.

Jeffrey L. Baxter, Dean J. Gengler, Chapman, Waters & Baxter, Leavenworth, KS, for Leavenworth Public Library, defendant.

### *MEMORANDUM AND ORDER*

VRATIL, District Judge.

Plaintiff Maxine Dunbar brings suit under the Age Discrimination in Employment Act [ADEA], 29 U.S.C. § 621 *et seq.,* claiming that in June of 1994, the Board of Directors of the Public Library of Leavenworth, Kansas refused to hire her because of her age. On March 4 through 6, 1998, plaintiff tried her case to the Court. For the reasons set forth fully below, the Court finds that plaintiff is entitled to judgment in this case.

### *Findings of Fact*

Consistent with the evidence presented at trial, the Court makes the following findings of fact: [1]

Plaintiff, who was born August 1, 1926, is 71 years old. She is a high school graduate and has been widowed since 1975. In 1988, after recovering from major surgery, she decided to look for clerical employment. Plaintiff had always wanted to work at the Leavenworth Public Library, and on August 9, 1988, in response to a newspaper advertisement, she applied for a job there. The Library did not hire plaintiff, or even interview her. Nonetheless, in December of 1988, plaintiff secured a position there under the Kansas Green Thumb program. Green Thumb is a federally subsidized program, administered by the United States Department of Labor, which helps low-income individuals over 55 receive job training and find unsubsidized employment. Under this program, Green Thumb placed eligible participants in host agencies. Host agencies agreed to provide job training and, if the participant's job training performance was satisfactory, to offer paid employment to that individual when an appropriate opening occurred. For its part, Green Thumb paid the participant's wages during the training process (20–22 hours per week, depending on available funds).[2] Plaintiff understood that she would be placed in a training position at

---

1. Neither party ordered a transcript in this case, and the Court has therefore prepared its factual findings from trial notes.

2. The record does not include a copy of the Host Agency Agreement which was in effect at the time Green Thumb assigned plaintiff to the Library. On April 8, 1991, however, the Library and Green Thumb executed the Host Agency Agreement which is Plaintiff's Ex. 3, and plaintiff and Green Thumb executed the Enrollment Agreement which is Defendant's Ex. 402. Both agreements are consistent with how the witnesses described the parties' agreements when Green Thumb first placed plaintiff at the Library.

In the Host Agency Agreement, the Library agreed that as a condition of its selection as a Green Thumb Host Agency, it would develop a training/work description for enrollees; provide enrollees with orientation, day-to-day supervision, instruction, training and supportive services; and "[m]ake every effort to assist enrollees in obtaining employment off Green Thumb by providing them with job skills and training, and by considering them for employment when appropriate openings occur."

In the Enrollment Agreement, plaintiff acknowledged that enrollment in Green Thumb was intended to be only temporary, to assist her in obtaining assistance off the program, and that Green Thumb would offer an average of 20 hours of training and work experience a week but no more than 1300 hours per grant year.

the Library for several months and that if her performance was satisfactory, the Library would offer her a paid position on its staff.

Plaintiff initially worked in the circulation department, where she was responsible for reshelving books, checking in books on the computer, organizing legislation from the Kansas legislature, filling in at the front desk, and organizing new books by subject matter. In January of 1992, plaintiff moved from the circulation department to the technical services department.[3] Shortly before that, on December 9, 1991, Green Thumb, plaintiff and the Library executed a three-way Placement Agreement.[4] The agreement stipulated that Green Thumb would temporarily place plaintiff in the Library and pay her minimum wage and fringe benefits for 22 hours a week for 12 weeks, from December 16, 1992 [sic: 1991] through March 6, 1992. In exchange, the Library agreed to hire plaintiff at the completion of the training period if plaintiff performed to the satisfaction of the Library. The Library also agreed that if plaintiff did not perform to its satisfaction and it therefore did not hire her, it would "document such for Green Thumb records." *See* Plaintiff's Ex. 4. The agreement also acknowledged that if the Library employed plaintiff, she would receive at least as much income as she then received from Green Thumb.

Plaintiff completed her training under the agreement on March 6, 1992. Despite its agreement with Green Thumb, however, the Library did not offer plaintiff a position, document any shortcomings in her performance, or explain why she was not being hired. Throughout this period and thereafter, plaintiff received good performance reviews. See Plaintiff's Ex. 16 (on September 25, 1991, rating plaintiff's overall performance as "very good"); Plaintiff's Ex. 5 (on August 12, 1992, rating plaintiff's overall per-

formance as "very good-excellent" and describing plaintiff as "a real asset" to the department). Plaintiff never received a complaint about her performance from either Shari Showalter, her supervisor, or Winnie Lichtenwalter, the Library Director. In fact, on September 25, 1991, Lichtenwalter told Green Thumb that the Library would be able to hire plaintiff in 1992. Plaintiff's Ex. 16. Again on October 26, 1993, plaintiff's supervisor reported to Green Thumb that plaintiff was a "real asset to our technical service dept" and that the Library had budgeted to add her to the library-paid staff in June, 1994. *See* Defendant's Ex. 407. When plaintiff inquired about the possibility of being placed on the Library staff, however—and she did so on more than one occasion—the Library responded that it did not have money in the budget to pay her.[5]

On June 14, 1993, the Library entered into a Cooperative Work Site Agreement with the Kansas Department of Social and Rehabilitation Services [SRS]. Plaintiff's Ex. 15. In that agreement, the Library agreed to participate in the KanWork program, which the State of Kansas established to give work experience to able-bodied persons receiving public assistance from SRS. Under this agreement, the Library agreed to provide jobs which would enable program participants to learn vocational skills and gain work experience. In return, SRS agreed to select participants for assignments at work sites, to provide payments of monthly participant expenses, and to make sure that needed services such as child care were in place prior to assignments.

On June 30, 1993, the Library placed Carol Rush, a KanWork participant, on its staff. Under the KanWork agreement, SRS paid Rush's entire salary for the first six months of her employment. After six months, in early January of 1994, the Library began to pay half of Rush's salary; it also agreed to

---

3. In that department, the Library trained plaintiff in technical services which included processing inter-library loans to prisons, putting covers on new books, putting the Library stamp in new books, entering books into the computer, taking books to appropriate departments, and similar tasks.

4. Winnie Lichtenwalter, Library Director, executed the agreement on behalf of the Library.

Lozene Aarstad, plaintiff's supervisor, executed the agreement on behalf of Green Thumb.

5. Lozene Aarstad, plaintiff's Green Thumb supervisor, also made numerous inquiries as to when the Library could put plaintiff on its payroll. The Library told her, as it told plaintiff, that it simply had no money to do so.

pick up 100% of her salary in 1995. Rush worked alongside plaintiff, as a technical services clerk, although she had no relevant experience in this area. Rush, who was 29 years of age, performed duties similar to those of plaintiff. Rush is still employed at the Library and currently works 30 hours per week at a salary of $6.00 per hour. She also receives benefits, including health insurance and retirement benefits.

When the Library placed Rush on its payroll, it had not offered plaintiff a Library position and it had told plaintiff that it had no money to pay her. Also, while the Library had told Green Thumb in October of 1993 that it had budgeted funds to add plaintiff to the library-paid staff in June of 1994, plaintiff was not aware of any such plan. In January or February of 1994, plaintiff learned that Rush had been placed on the Library payroll. She went to Lichtenwalter, in May of 1994, to ask "what's the deal?" Lichtenwalter told plaintiff that the Library could probably get her a position for 20 or 22 hours per week at $5.00 an hour. Plaintiff asked Lichtenwalter to find out what shift it would be and to call her Green Thumb supervisor, Lozene Aarstad, to work out the details. Plaintiff also indicated that she needed to check whether the offer would interfere with her right to receive Social Security benefits. Plaintiff did not believe that Lichtenwalter was offering her a job at that time, but she thought that Lichtenwalter was going to work on it, that the details would be worked out, and that she was going to go on the Library payroll.[6] According to Lichtenwalter, the offer which she extended to plaintiff was a firm one; while plaintiff said that she would have to think about it, Lichtenwalter assumed that her proposal was "all right" and that plaintiff would go on the Library payroll.

When June came around, however, the Library made no effort to put plaintiff on its payroll. Lichtenwalter retired on May 31 without putting plaintiff on the Library payroll or following through on any part of her plan to do so. Lichtenwalter's successor, Terry McLaughlin, likewise did nothing. Plaintiff and Green Thumb let the situation coast through the end of June and into July. In late July, Aarstad and plaintiff talked to McLaughlin in the hallway.[7] Aarstad asked McLaughlin if he was going to give plaintiff a job. According to plaintiff, McLaughlin said no, that there was no money this year and that there would be no money next year. According to Aarstad, McLaughlin said that if he had the money, he could offer 17 hours a week at $6.00 an hour, but that he could not promise that any money would be budgeted for the following year.[8]

In July, plaintiff also had discussions with Patricia Barnhardt, a member of the Library Board, about her situation. By this time, plaintiff was frustrated and angry about the Library's refusal to put her on the payroll after more than five years of training, its decision to hire Rush, and her belief that the Library had lied when it said it had no money to put her on the payroll. The discussions with Barnhardt were unproductive. The Library made various suggestions regarding the possibility of employment, but none of them satisfied plaintiff. Aarstad therefore decided to remove plaintiff from the Library and place her in a different on-the-job training program. As late as January, 1995, however, Aarstad was unable to find another position for plaintiff. On January 28, 1995, she therefore removed plaintiff from the Library and put her on leave without pay until another position could be secured.[9]

6. If plaintiff had understood the offer to be a firm one, she would have accepted it at the time. Lichtenwalter did not have the authority to hire library staff without the approval of the Board of Directors, but the record suggests that her recommendations were generally accepted with little or no modification.

7. According to plaintiff, this conversation occurred sometime after her meeting with Patricia Barnhardt, a member of the Library Board, on July 18, 1994.

8. The Library's fiscal year runs January 1 through December 31. Therefore it is not surprising that plaintiff would prefer to retain her Green Thumb position, and decline McLaughlin's offer of employment for the five months remaining in 1994, given a dismal prospect for continuing employment.

9. Plaintiff was out of work during part of January and all of February, 1995. From March 9, 1995, through March, 1996, she worked in the office of Leavenworth High School. Plaintiff then moved to the Leavenworth County Special

Meanwhile, on August 26, 1994, plaintiff filed a charge of discrimination with the EEOC. In that charge, she alleged that the Library had denied her employment because of her age, in violation of the ADEA.

Plaintiff offered no direct evidence of discrimination. She admits that no one at the Library told her that she was too old to work there, and she does not allege that anyone made explicit age-related statements to her.

### Conclusions of Law

██ Plaintiff claims that defendant discriminated against her on the basis of age when it failed to hire her in June of 1994. *See Pretrial Order* at ¶ 3 (Doc. # 40) entered December 10, 1997. To prevail on her ADEA claim, plaintiff must establish that age was a "determining factor" in defendant's failure to do so. *Greene v. Safeway Stores, Inc.,* 98 F.3d 554, 557 (10th Cir.1996). Although plaintiff need not prove that age was the sole reason for the Library's acts, she must show that age "made the difference" in the Library's decision not to hire her. *Id.* Plaintiff may utilize either of two general proof schemes to meet this burden— directly, by presenting direct or circumstantial evidence that age was a determining factor in the Library's failure to hire her or, more typically, indirectly under the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802– 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Greene,* 98 F.3d at 557.

In this case, plaintiff admits that she has no direct evidence of age discrimination. Accordingly the Court considers her evidence under the *McDonnell Douglas* burden-shifting scheme. Under this burden-shifting analysis, plaintiff first must establish a prima facie case of discrimination by showing (1) that she belongs to the protected class; (2) that she applied for and was qualified for a position with the library; (3) that despite her qualifications she was not hired; and (4) that the library filled the position with someone sufficiently younger to permit an inference of age discrimination or continued to seek applicants from individuals having qualifications similar to those of plaintiff. *See Lewis v. McDonnell Douglas Corp.,* 77 F.3d 492, *3

Education Cooperative, where she worked at the time of trial. Throughout all relevant periods,

(10th Cir.1996) (Table, available on Westlaw at 1996 WL 77038) citing *Coe v. Yellow Freight Sys., Inc.,* 646 F.2d 444, 448–49 (10th Cir.1981).

██ The first and third elements of plaintiff's prima facie case are not in dispute: plaintiff is within the statutorily protected age group and the library did not hire her. Plaintiff also applied for and was qualified for a position with the library. Although plaintiff did not submit a formal written application for a job after August 1988, employment discrimination law does not require that a plaintiff formally apply for the job in question. *Whalen v. Unit Rig, Inc.,* 974 F.2d 1248, 1251 (10th Cir.1992) *cert. denied* 507 U.S. 973, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993). It is sufficient that "the employer either be on specific notice that the plaintiff seeks employment or, where informal hiring procedures are used, that the plaintiff be in the group of people who might reasonably be interested in the particular job." *Id.*

Defendant had specific notice that plaintiff sought employment with the library and as a host agency, it had agreed to consider her for available positions. Plaintiff's Green Thumb supervisor approached the library director at least twice a year to inquire about placing plaintiff on the Library staff. The Library in fact agreed to hire plaintiff in June of 1994. Plaintiff has therefore satisfied the requirement that she apply for a position with the Library.

██ Plaintiff has also established that she was qualified for a technical services position and that despite her qualifications, the library hired a younger individual under circumstances which give rise to an inference of age discrimination. Plaintiff had worked at the Library since December 1988. Plaintiff's yearly performance reviews were always favorable and indeed, plaintiff's 1993 performance review stated that she was a "real asset" to the department and that the Library planned to hire her in the summer of 1994. Moreover, Lichtenwalter testified that after her meeting with plaintiff in May of 1994, she expected that plaintiff would be put on the payroll in the immediate future. In late 1993 or early 1994, the Library began

Green Thumb paid plaintiff at least a minimum wage salary for 20–24 hours per work week.

funding half of Rush's salary under the Kan-Work program, even though she had worked there for only six months and the Library claimed that it had no money to put plaintiff on the payroll. Rush worked in the technical services department and performed job duties similar to plaintiff's. The Court finds that plaintiff has established a prima facie case of discriminatory refusal to hire.

Establishing a prima facie case creates a presumption that the Library unlawfully discriminated against plaintiff. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Accordingly the burden shifts to defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Id.* at 506–07, 113 S.Ct. 2742. If defendant meets its burden of production, the presumption created by the prima facie case is rebutted and drops from the case. *Id.* at 507, 113 S.Ct. 2742. Plaintiff then has the opportunity to demonstrate through the presentation of her own case and through cross-examination of defendant's witnesses that the proffered reason was not the true reason for the employment decision, but rather that defendant was motivated by intentional discrimination in violation of civil rights laws. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Randle v. City of Aurora,* 69 F.3d 441, 453 n. 18 (10th Cir.1995). "In the final analysis, the court is required to weigh all the evidence and to assess the credibility of witnesses in order to determine whether the plaintiff was a victim of intentional discrimination based upon protected class characteristics." *Goodwin v. M.C.I. Communications Corp.,* 134 F.3d 382, *2 (Table, available on Westlaw at 1998 WL 42562) (10th Cir.1998) (quoting *EEOC v. Flasher Co.,* 986 F.2d 1312, 1317 (10th Cir.1992)).

■ At trial, defendant asserted that the legitimate nondiscriminatory reason why it failed to put plaintiff on the payroll was that it made a job offer to plaintiff but she turned it down. Accordingly, the burden returns to plaintiff to demonstrate that defendant's proffered reasons are pretextual. Plaintiff did so at trial. Defendant's assertion is at odds with the evidence. Clearly plaintiff did not turn down the position which Lichtenwalter offered in May of 1994. At the conclusion of their meeting, both Lichtenwalter and plaintiff understood that details remained to be worked out. Lichtenwalter needed to contact Green Thumb and get back to plaintiff with details about the proposed shift assignment. Plaintiff needed to think about the proposal and make sure that the transfer would not affect her Social Security benefits. Both parties to the conversation testified at trial, and neither claimed that plaintiff turned down a job offer by Lichtenwalter. Also, because defendant never made any effort to put plaintiff on its payroll in June 1994, the Court is hard pressed to understand why the Library could legitimately believe that plaintiff had rejected a job offer by Lichtenwalter or refused to work under the conditions which she offered.[10]

■ It is well-settled that the factfinder's disbelief of the reasons put forward by defendant may, together with the elements of the prima facie case, suffice to show intentional discrimination. While the two do not compel such a finding, they permit the finder of fact—in this case, the Court—to draw an inference of illegal discrimination. *See Goodwin,* 134 F.3d 382, 1998 WL 42562 at *4; *Greene,* 98 F.3d at 563–64; *Ziegler v. K-Mart Corp.,* 74 F.3d 1250, *5 (10th Cir.1996) (Table, available on Westlaw at 1996 WL 8021) (citing *Randle,* 69 F.3d at 451). Nevertheless, plaintiff at all times bears the bur-

---

10. Given the dearth of such evidence, the Library wants to focus the Court's attention on evidence that plaintiff turned down *other* offers, extended by McLaughlin and Barnhardt in July and August of 1994. The apparent point of such evidence is to show that because plaintiff did not accept certain offers in July and August, she would have rejected a similar offer in June.

Such after-the-fact evidence is not persuasive, however, in this case. The relationship between plaintiff and the Library quite obviously deteriorated after Lichtenwalter retired without follow-ing through on her offer to place plaintiff on the payroll and the new director ignored the problem upon his arrival. In view of the polarization which occurred as a result of that deterioration, the fact that plaintiff did not embrace the Library's proposals in July and August does not mean that she would have rejected a similar situation in June—had it been timely finalized. The Court credits plaintiff's testimony that Lichtenwalter's proposal was acceptable to her and that plaintiff would have accepted that position as offered, if the Library had extended it in June.

den of persuasion to convince the factfinder not only that the defendant's proffered reason was pretextual, but that its pretext "concealed a motive of discriminating against the plaintiff in violation of the civil rights laws." *Randle,* 69 F.3d at 453 n. 18.

This is a close case. Having considered the evidence at great length, however, the Court finds that plaintiff's showing of pretext, combined with the elements of her prima facie case, evidences intentional discrimination in this case. In cases involving challenges to seniority systems under the ADEA, the Tenth Circuit Court of Appeals has held that while liability depends upon proof of disparate treatment, discriminatory treatment may be shown by indirect circumstantial evidence, including evidence of discriminatory impact. *Harvey v. United Transportation Union,* 878 F.2d 1235, 1244–46 (10th Cir.1989), *cert. denied* 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990) (inquiry must move beyond facial neutrality into disparate impact, for facially neutral system may be mask for gross inequality beneath); *Hiatt v. Union Pac. R.R.,* 65 F.3d 838, 842 n. 4 (10th Cir.1995), *cert. denied* 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996) (while challenge to routine operation of bona fide seniority system must rest upon claim of disparate treatment, disparate impact may be evidence of intentional discrimination).[11] Similarly in this case, in deciding whether plaintiff should be allowed to prevail upon her showing of pretext, combined with the elements of her prima facie case, the Court takes into account the fact that age was very definitely a factor that permeated defendant's six-year relationship with plaintiff. Plaintiff was introduced to the Library through Green Thumb, the very purpose of

which was to help low-income individuals over 55 receive job training and find unsubsidized employment. The Library exploited both plaintiff and the Green Thumb program for six years. To its credit, it provided job training skills, as agreed. At the same time, it prevented plaintiff from securing unsubsidized employment at the Library and it manipulated plaintiff and Green Thumb to prevent them from seeking alternative placements for plaintiff. It denied repeated requests by plaintiff and Green Thumb that plaintiff be placed on the Library payroll. All the while, it prevented plaintiff from looking for other employment by telling her that she was doing a fine job and by dangling express and implied promises of future employment opportunities— with no evident intent of carrying through on its contractual obligations or its statements to the affected parties. The Library was able to capitalize on plaintiff's free labor precisely because of her age and low income status, which had qualified her for participation in the Green Thumb program in the first place.[12] On these facts, the Court is persuaded that plaintiff's age was a determining factor in the Library's failure to put her on the payroll in June of 1994. *See Greene,* 98 F.3d at 557 (although plaintiff need not prove that age was the sole reason for employer's determination, she must show that age "made the difference").

### Damages

■ By way of damages, plaintiff seeks the difference between what she earned as a minimum wage Green Thumb participant (20–22 hours per week at $5.15 an hour, or $103.00 to $113.30 per week) and the salary which Carol Rush earned at the Library (30 hours per week at $6.00 an hour, or $180.00).[13] Plaintiff seeks damages from

---

11. The Court recognizes that plaintiff cannot bring a disparate impact claim under the ADEA. *Ellis v. United Airlines, Inc.,* 73 F.3d 999, 1007 (10th Cir.1996).

12. If the Library had articulated budgetary constraints as a legitimate nondiscriminatory reason for its failure to hire plaintiff, this case would present an interesting question whether—because advanced age is a prerequisite for participation in the Green Thumb program—age was a proxy for free labor. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). In fact, defendant did present evidence that it could not afford to add plaintiff to its payroll. This line of defense was so thoroughly discredited on cross-examination, however, that defense counsel abandoned it by the time of closing argument. Even Lichtenwalter testified that it would be only "somewhat correct" to say that in more than five years, the Library never had enough money to put plaintiff on the payroll.

13. Plaintiff did not request liquidated damages, prejudgment interest or the value of lost fringe benefits. On the other hand, defendant did not present a mitigation defense.

 

January 1, 1994, when Rush went on the Library payroll, through May, 1998, the date of plaintiff's retirement. Using these figures, plaintiff seeks a weekly damage sum of $66.70 to $77.00. The Library correctly notes, however, that the record is devoid of evidence that plaintiff wanted to work 30 hours a week or that the Library had any need to extend her work hours past 20–22 hours per week. As a result, the proper comparison is to calculate the difference between what plaintiff earned as a minimum wage Green Thumb participant ($103.00 to $113.30 per week) and the salary which Rush earned for a similar week at the Library (20–22 hours per week at $6.00 an hour, or $120.00 to $132.00). Using these figures, the Court finds that on average, plaintiff earned $17.85 per week less than Rush, or $77.35 per month.

■ The Court finds that an award of back pay and front pay is appropriate in this case, but that damages should not accrue until June, 1994, when plaintiff alleges that defendant violated the law by refusing to hire her. At trial, counsel estimated that plaintiff's back and future wage claim was approximately $60.00 per month for 53 months (48 months in 1994, 1995, 1996 and 1997, and five months of 1998), or a total of $3,180. The Court finds that a more accurate estimate is as follows:

| | |
|---|---|
| 1994 (June–December) | $ 541.45 |
| 1995 | $ 928.20 |
| 1996 | $ 928.20 |
| 1997 | $ 928.20 |
| 1998 (January–May) | $ 386.75 |
| | $3,712.80 |

Accordingly, the Court finds in favor of plaintiff, and against defendant, and orders that defendant pay plaintiff $3,712.80 as damages for unlawful discrimination pursuant to the Age Discrimination in Employment Act. *See* 29 U.S.C. § 626(b) (authorizing back pay award); *see also James v. Sears, Roebuck & Co.,* 21 F.3d 989, 997 (10th Cir.1994) (Court has discretion to award front pay in lieu of restatement).

**IT IS THEREFORE ORDERED** that judgment be entered in favor of plaintiff Maxine Dunbar on all claims, and that she be awarded $3,712.80 in actual damages. Pursuant to 28 U.S.C. § 1447(c), defendant is

also ordered to pay the just costs and actual expenses, including attorneys' fees, incurred as a result of its unlawful activity. The parties are directed to consult D. Kan. Rule 54.2 for the procedures to be followed in determining that amount.