Sandra RIECHMANN, Plaintiff,

v.

CUTLER–HAMMER, INC. and Eaton
Corporation, Defendants.

No. Civ.A. 99–2052–CM.

United States District Court,
D. Kansas.

April 10, 2000.

Steven D. Horak, Overland Park, KS, for Sandra Riechmann, plaintiff.

Jack L. Whitacre, Eric W. Smith, Spencer, Fane, Britt & Browne, Kansas City, MO, John J. Doyle, Jr., Jill S. Stricklin, Constangy, Brooks & Smith L.L.C., Winston–Salem, NC, Michael L. Blumenthal, Constangy, Brooks & Smith, L.L.C., Kansas City, MO, for Cutler–Hammer, Inc. and Eaton Corp., defendants.

### MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff Sandra Riechmann filed suit against defendants Cutler–Hammer, Inc. and Eaton Corporation alleging that defendants discriminated against her on the basis of her disability, failed to accommo-

date her disability and subjected her to disability-based harassment, all in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Plaintiff further asserts defendants made improper medical inquiries regarding her medical condition in violation of the ADA. Finally, plaintiff asserts that defendants retaliated against her when she requested an accommodation under the ADA. This matter is presently before the court on defendants' motion for summary judgment (Doc. 33). Plaintiff has also filed a motion for partial summary judgment (Doc. 36).[1] As set forth in more detail below, defendants' motion for summary judgment is granted in part and plaintiff's complaint is dismissed in part. Further, plaintiff's motion for partial summary judgment is rendered moot.

## I. Background

### A. Plaintiff's Employment Background

The following background information is viewed in the light most favorable to the plaintiff, the nonmoving party. Defendants Eaton Corporation and Cutler–Hammer, Inc. manufacture and sell electrical distribution products for residential, commercial and industrial use. On July 19, 1968 defendants hired plaintiff Sandra Riechmann as a secretary at their Shawnee Mission, Kansas sales office. After working approximately ten years as a secretary, plaintiff became a technical sales assistant ("TSA"). As a TSA plaintiff provided quotes on defendants' products to customers and performed other customer service activities. Plaintiff worked at defendants' Shawnee Mission facility until November 26, 1986 when her position was eliminated as a result of a workforce reorganization and plaintiff was separated from the company.

---

1. Plaintiff incorporates the arguments raised and exhibits presented in her motion for partial summary judgment into her response to defendants' motion. Accordingly, the court has considered all materials referenced.

In February 1987, Challenger Electric Equipment ("Challenger"), a competitor of defendants in the electrical distribution industry, hired plaintiff. Plaintiff worked in Challenger's sales office in Overland Park, Kansas as an inside sales representative. Plaintiff's job duties included providing sales quotes to customers, expediting orders, performing customer service activities, and providing support for outside sales representatives who made calls to contractors at their job-sites. These responsibilities were similar to those plaintiff had performed as a TSA for defendants. In November 1992, Challenger promoted plaintiff to the position of outside sales "OS" representative. As an OS representative for Challenger, plaintiff's duties included calling on electrical contractors, determining what electrical equipment was necessary for each job by analyzing blueprints, and satisfying her sales quota. Because she was the only salesperson in Challenger's Overland Park office at the time, plaintiff performed her own inside support functions. Challenger did not provide plaintiff with training for the OS position. Essentially, plaintiff learned the job "by osmosis" and "trial by fire."

In February 1994 defendants acquired Challenger. Plaintiff continued to work out of the same office, call on the same customers, sell the same Challenger products and compete against defendants. On June 1, 1994, however, plaintiff began reporting to defendants' district sales manager Kent Fisher. Plaintiff testified she did not enjoy a good working relationship with Mr. Fisher. She was uncomfortable with Mr. Fisher's personality and management style, describing it as more "hands-on" that her previous managers. Plaintiff testified Mr. Fisher had zero tolerance for mistakes and he typically reacted to commonplace sales errors as though they were "five alarm fires."

Mr. Fisher was critical of plaintiff's job-related performance. As early as September 1994, Mr. Fisher documented problems with plaintiff's performance, involving errors she made when quoting prices to customers. Plaintiff testified that Mr. Fisher always seemed to be "on her case" about sales errors, flooded her with correspondence, and hounded her about sales discrepancies. Plaintiff often voiced her objection to Mr. Fisher's criticisms. She testified that his management style caused her to feel "harassed."

On March 18, 1996, Mr. Fisher rated plaintiff's job performance as "competent," noting that "changes must be made both personally and professionally" if plaintiff was to succeed in sales. Mr. Fisher criticized plaintiff's organizational and decision making skills, as well as her failure to delegate duties to inside sales support. In January 1997, Mr. Fisher rated plaintiff's job performance as "commendable." In her 1997 performance appraisal, Mr. Fisher noted that plaintiff had labored to improve upon the areas of concern from the prior year's review. Although plaintiff received a favorable review, Mr. Fisher did continue to hold plaintiff accountable for mistakes during 1997. In response to one of plaintiff's errors, Mr. Fisher noted that it was "inexcusable" for someone in her position to make such a mistake. Plaintiff testified that Mr. Fisher's criticism was overly harsh.

## B. Plaintiff Stroke in June 1997 and Subsequent Disability Leave

On June 29, 1997, plaintiff suffered a severe stroke at her home that left her partially paralyzed on her left side. Following the stroke, plaintiff spent one week in the hospital, followed by six weeks at a rehabilitation center undergoing extensive physical and occupational therapy. Plaintiff's stroke also caused reflex sympathy dystrophy in her left arm, a painful nerve condition that prevents her from using her left arm.

From June 30, 1997 to January 2, 1998 plaintiff did not perform any work for

defendants.[2] During this same period, plaintiff collected short-term disability benefits from defendants amounting to her regular salary, including incentive pay. In November 1997, plaintiff requested to be returned to work on December 1, 1997. However, plaintiff's physician, Dr. Robert Kurth, did not release plaintiff to return to work until December 8, 1997. Dr. Kurth released plaintiff for work with restrictions, including a limitation to light duty work and to working part-time with a maximum of four hours per day, three days per week. Plaintiff was also restricted from driving. These restrictions were effective for a period of three months, from December 8, 1997 through the end of February 1998.[3]

During plaintiff's absence in 1997, defendants consolidated the Challenger office with its other sales organizations, resulting in extensive changes in company structure. Defendants implemented a new over-all sales philosophy, focusing upon a narrower market. The sales offices began handling a more diverse group of electrical distribution products, including products from all of the former individual companies. The products were integrated into a single sales catalog, and were assigned new names and catalog numbers. Additionally, the new "optimized" sales personnel began using a new email system and new forms for preparing sales quotes and bids. Defendants also installed two new order entry systems for use by inside and outside sales personnel—Vista and an updated version of Bid Man. The new order systems were significantly different from those that had been utilized at the Challenger sales offices where plaintiff had worked.

## C. Plaintiff's Return to Limited Duty Inside Sales Position in January 1998

Consistent with her work restrictions, plaintiff returned to work in a limited duty, part-time assignment in defendants' Kansas City sales office on January 5, 1998. Plaintiff was assigned to perform inside sales support duties, similar to her former responsibilities as a TSA for Cutler–Hammer and as an inside sales representative for Challenger. Plaintiff received her regular salary throughout her inside sales assignment from January through May 1998.[4] Plaintiff testified that she could see

2. Plaintiff's affidavit, submitted in connection with her memorandum in opposition to defendants' summary judgment motion asserts defendants refused her request to return to work prior to January 2, 1998. (P.'s affidavit, ¶ 3). Plaintiff's own deposition testimony wherein she states she cannot recall any statements made by defendants indicating she could not return to work prior to January 2, 1998, contradicts this assertion. Accordingly, the court will disregard this portion of plaintiff's affidavit in connection with this summary judgment ruling. See Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir.1986) (court may disregard an affidavit that "constitutes an attempt to create a sham fact issue").

3. Although plaintiff asserts in her affidavit that she indicated to defendants on January 6, 1998 that her doctor would release her to work without restrictions and on a full time basis at an earlier date, there is no evidence plaintiff presented a release from her medical restrictions to defendants. (P.'s Aff. ¶¶ 4, 15). Additionally, plaintiff asserts she did not have a driving restriction when she returned to work in January 1998. (P.'s Aff. ¶ 4). Plaintiff has presented a drivers program evaluation summary from The Rehabilitation Institute, dated November 21, 1997, this exhibit is not proper Rule 56 evidence, as plaintiff has failed to authenticate the report through supporting affidavits or deposition from persons with personal knowledge of the facts contained in the report. See Fed.R.Civ.P. 56(c) & (e); D.Kan.Rule 56.1. Therefore, the court does not consider it. In any event, plaintiff's own deposition testimony that Dr. Kurth's restrictions (which included a driving restriction) lasted through February 1998 contradicts her assertion.

4. Plaintiff asserts in her memorandum in opposition that her affidavit controverts the defendants' assertion that plaintiff was paid her regular salary or incentive pay from January through, May 1998. (P.'s mem. in opp. ¶ 22, p. 13). However, the affidavit does not mention her compensation through this time period. (P.'s Aff. ¶¶ 1–19). Further, plaintiff's deposition testimony directly contradicts her assertion. Accordingly, the court does not

that working in her limited duty assignment would be a "bad situation." Plaintiff was placed in a position to work side by side with personnel against whom she had fiercely competed while at Challenger. Plaintiff felt like an "outsider" working in the "enemy camp." Plaintiff also testified that it was physically taxing for her to work a four-hour day and to drive herself to and from the office. Plaintiff was also concerned because her left shoulder had begun "freezing up," potentially necessitating visits to the doctor. Plaintiff believed that it would be more convenient for her to work out of her home, which was close to her doctors' offices.

On January 6, 1998 plaintiff sent an email to Mr. Fisher, requesting permission to work at home.[5] Mr. Fisher denied her request, explaining that as inside sales support personnel she needed to be on-site. Mr. Fisher also asked plaintiff to establish a regular working schedule, indicating that the outside sales support needed to know when she would be available to assist them.

Shortly after plaintiff's return to limited duty work, Mr. Fisher began receiving feedback from sales personnel and from defendants' customers that plaintiff lacked enthusiasm, that she seemed to have problems with short-term memory, that her sales quotations were frequently inaccurate despite her co-workers attempts to provide assistance, and that she continued to make sales calls although she had been instructed to perform her assigned inside sales duties consistent with her work restrictions.[6] One of plaintiff's former customers at Challenger, Jeff Schlitzer, testified that contrary to Mr. Fisher's assertions, neither he nor anyone at Electrical Materials ever made a complaint to defendants regarding plaintiff's work. Mr. Fisher further testified that plaintiff seemed to regard her inside support role as a form of "punishment," and that she expressed a desire to resume her former outside sales responsibilities despite her work restrictions.

### D. Plaintiff's February 1998 Independent Medical Exam and Assignment to Full Time Inside Sales Position

In late January 1998, defendants asked plaintiff to undergo an independent medical examination ("IME") to determine whether she was medically able to return to an OS position. Plaintiff had not yet been released by a physician to resume full-time regular duty employment. Plaintiff continued to have restricted use of her left arm and have limited mobility. Defendants scheduled an appointment for the IME with Dr. Vito Carabetta on February 5, 1998. Defendants requested that Dr.

find defendants' assertion has been controverted.

**5.** Plaintiff asserts in her affidavit that she requested to return to work at home in an outside sales, rather than an inside sales position. (P.'s Aff. ¶ 4). However, plaintiff testified in her deposition that she "had an exchange of e-mail messages with Mr. Fisher about [her] request to do this inside sales support work from [her] home as opposed to the [defendants'] office." The court finds this testimony directly contradicts her affidavit assertions. Accordingly, the court does not find defendants' assertion has been controverted and will disregard this portion of plaintiff's affidavit. *See Franks,* 796 F.2d at 1237.

**6.** Plaintiff argues that facts regarding statements made by defendants' sales personnel and its customers constitute inadmissible hearsay. The court rejects plaintiff's argument. Defendants have not offered the statements to prove the truth of the matter asserted, but to show defendant's motive in taking action regarding plaintiff's employment. See Fed.R.Evid. 801(c) (hearsay defined as a statement "offered in evidence to prove the truth of the matter asserted"); *Denison v. Swaco Geolograph Co.,* 941 F.2d 1416, 1423 (10th Cir.1991) (exhibit not hearsay because it was not offered to prove the truth of its contents, but to show defendant's motivation during a reduction in force). As noted above, however, the court does recognize the controversion of any assertion that Jeff Schlitzer, a former Challenger customer, made negative comments regarding plaintiff's work performance to defendants.

Carabetta perform the IME and determine plaintiff's " 'fitness' or 'inability' to perform the essential duties of [the OS] job." Defendants also requested any information regarding restrictions plaintiff may have in performing the job.

On February 5, 1998 Dr. Carabetta completed the IME, opining that plaintiff was physically capable of resuming her former OS representative duties, but indicated she did not have use of her left arm. Consequently, plaintiff would require assistance with job duties requiring bilateral arm usage. Dr. Carabetta rated plaintiff's ability to function independently as "fair."

Jeff Android, one of defendants' human resource personnel, testified that he was surprised by the results of Dr. Carabetta's IME because be believed the plaintiff had limited mobility. Mr. Android testified that his manager, Mr. Fisher, told him plaintiff may have difficulties performing the job of outside sales because of her limited use of her left arm.

On March 9, 1998, following the expiration of Dr. Kurth's restrictions, Mr. Fisher, Mr. Android, and Jim Bachard the regional manager, met with plaintiff to discuss her return to full-time employment. At the time, there were no vacant OS positions in defendants' Kansas City sales office.[7] In addition, plaintiff continued to have difficulties performing her inside sales assignments.[8] Accordingly, defendants assigned plaintiff to a full-time inside sales position pending the availability of an OS position and pending her demonstrated

ability to function in the inside sales job. During the meeting, defendants told plaintiff she would be assigned to an interim full-time inside sales position with the understanding that the inside sales duties would familiarize her with the company's new order entry systems, products, catalog and sales philosophy. Defendants informed plaintiff that when she became proficient in the inside sales job, she would be considered for any available OS positions. Plaintiff had succeeded in the inside sales position for 18 years prior to her stroke. Plaintiff indicated at the meeting that she did not have a problem with the interim assignment, but complained she did not like working in the consolidated sales office because she was required to work with people who were formerly her "enemies." Further, plaintiff consistently indicated to defendants that she wished to be returned to an OS position.

Within one week of the meeting, plaintiff informed defendants she would be taking vacation days every Monday in March and April. In response, Mr. Fisher sent her an email inquiring about the vacation days. Plaintiff responded by noting, "quite frankly, I'll do anything to reduce my sentence, even burn vacation days." Plaintiff testified that she felt she had been "sentenced" to "life without parole." Mr. Fisher indicated that plaintiff had "missed the whole point." Mr. Fisher explained that plaintiff's inside sales assignment had nothing to do with a time frame and instead, defendants' intent was to educate plaintiff with respect to the new systems,

---

**7.** Although plaintiff attempts to controvert this fact, the testimony of Mr. Fisher she cites in support does not support her assertion that there were OS positions open in the Kansas City sales office in early 1998. (P.'s mem. in opp. ¶ 17, p. 4). Accordingly, the court finds this fact has not been controverted by plaintiff.

**8.** Although plaintiff attempts to controvert this fact, she provides no evidence that she was not having difficulties with her performance. Instead, plaintiff asserts that she was not provided the necessary training to succeed, implying this was the reason for her

work performance. (P.'s mem. in opp. ¶¶ 18–24, pp. 4–5). However, plaintiff's own testimony regarding her training contradicts her assertion. Plaintiff testified during her deposition that she attended a formal Bid Man training class sponsored by defendants in March 1998. She further testified that defendants provided her with individualized training on Vista and the revised Bid Man program on numerous occasions from January through May 1998. Plaintiff also admitted that defendants provided offers of additional training during May and April 1998, which she declined.

order entry processes, and products in the consolidated sales office so that she could be successful when she returned to an OS position.

Although Mr. Fisher did not dispute plaintiff's entitlement to the vacation days, he emphasized that she could not get "educated and up to speed" if she was not in the office performing her job duties. Plaintiff replied by indicating she was well-aware of her need for re-education, acknowledging that she was reminded of this every time she tried to use the revised Bid Man order entry system. Plaintiff again complained that she was unhappy in the consolidated sales office because she was forced to work with the former competition and it kept her from her preferred OS job. Mr. Fisher encouraged plaintiff to use the assignment as a learning experience so she could resume her OS job with greater success.

In late March 1998, plaintiff and Mr. Fisher exchanged a series of emails that discussed, among other items, her frequent departures from work and her failure to keep a regular schedule. Mr. Fisher requested that plaintiff keep the company informed if she was to be out of the office for any reason during working hours.

Mr. Fisher became increasingly concerned with plaintiff's sales errors, which had resulted in complaints from defendants' customers and from outside sales personnel who depended upon her. Mr. Fisher instructed plaintiff not to send out sales quotations until they had been reviewed. He offered her additional training on the Bid Man program. Plaintiff declined the additional training, indicating she was "very comfortable" with Bid Man. For a period of time, defendants also required that plaintiff sign onto the computer system as Erin Kaiser, a secretary/administrative assistant in defendants' St. Louis office so that every time plaintiff entered an order it would come back to Ms. Kaiser for review. No other inside sales person was required to sign on under Ms. Kaiser's number. On March 26, 1998

Mr. Fisher requested that Lanita Bohn, a secretary, keep a written log of plaintiff's time. Ms. Bohn generally kept track of the inside sales staffs' "comings and goings." Mr. Fisher did not request that Ms. Bohn keep a written log for any other employee.

Some of defendants' Kansas City outside sales personnel stopped sending work through plaintiff due to the problems with the accuracy of her work. In addition, plaintiff ostracized herself from her co-workers. Accordingly, plaintiff had very little work to do. Plaintiff testified that she was given very little work to do from the time she returned to work in January 1998.

On or about April 10, 1998, plaintiff met with Mr. Fisher and Mr. Bachard. They informed her they had numerous concerns about her job performance. Specifically, defendants informed plaintiff that her refusal to adhere to a regular work schedule, her repeated mistakes on quotations, her failure to follow-up with customers in a timely and accurate manner, the complaints from customers that she had failed to return phone calls, and the disruptive effect her negative attitude regarding her work assignment had on her co-workers were of concern to them. Plaintiff conceded that she had a poor attitude about her inside sales position and indicated she wanted to be returned to outside sales. Defendants offered her additional training on Bid Man and Vista systems. Plaintiff refused, explaining that she fully understood the programs.

### E. Plaintiff's Disability Leave Beginning May 1998

On May 14, 1998 plaintiff informed Mr. Fisher she intended to apply for short term disability leave. Plaintiff explained, "I was not going to do this, but I feel I have no choice at this point … I realize now that I do not have my strength back. I fight to stay awake at my desk, as well as driving home." Plaintiff testified that

she had been having these difficulties since returning to work in January 1998 and she attributed the problems to her stroke. In contrast, plaintiff's affidavit asserts that she sought disability leave due to the harassment she felt at work and the defendants' failure to return her to an OS position.

On May 18, 1998 plaintiff went on short term disability leave, continuing to receive her regular salary throughout the six month term of short term disability. On December 2, 1998, plaintiff applied for long-term disability benefits. Plaintiff was awarded long-term disability benefits, which were made retroactive to November 1998. At the time the parties filed these papers, plaintiff remained an employee of defendants and continued to receive long-term disability benefits from the defendants' insurance carrier.

On December 23, 1998, plaintiff applied for Social Security disability benefits. On May 15, 1999, plaintiff was awarded full disability benefits by Social Security, which were made retroactive to November 1998. In its decision granting such benefits the Social Security Administrator concluded that plaintiff had ·become disabled effective May 18, 1998. As of the date the parties filed these papers, plaintiff continued to receive Social Security disability benefits as well as long-term disability benefits and remained an employee of defendants.

## II.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A

fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (*citing Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every ac-

tion." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (*quoting* Fed.R.Civ.P. 1).

## III. General Discrimination and Failure to Accommodate

■ The ADA prohibits a covered entity from discriminating against a "qualified individual with a disability" because of the individual's disability with respect to terms, conditions, and privileges of employment. See 42 U.S.C. § 12112(a); *Martin v. State of Kansas*, 190 F.3d 1120, 1129 (10th Cir.1999) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 2144, 144 L.Ed.2d 450 (1999)). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Martin*, 190 F.3d at 1129 (*citing* 42 U.S.C. § 12111(8)). Thus, to establish a prima facie case under the ADA, plaintiff must demonstrate that: (1) she is disabled within the meaning of the ADA; (2) she is qualified, that is, with or without reasonable accommodation, she is able to perform the essential functions of the job; and (3) she was discharged or demoted because of her disability. *See id.* As set forth below, plaintiff has not produced sufficient evidence with respect to the second element of her prima facie case. Accordingly, summary judgment in favor of defendant is appropriate.

### A. The "Disabled" Requirement

Under the ADA, a "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.* at 1129 n. 7 (*quoting* 42 U.S.C. § 12102(2)). Here, for purposes of its summary judgment papers, defendants do not dispute that plaintiff is "disabled" within the meaning of the ADA. Defendants assert, however, that plaintiff is not a "qualified individual with a disability" within the meaning of the Act.

### B. A "Qualified Individual" with a Disability

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Martin*, 190 F.3d at 1129 (*quoting* 42 U.S.C. § 12111(8)). The Tenth Circuit has adopted a two-tiered analysis for determining whether a person is "qualified" under the ADA:

First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*See id.* at 1129–30 (*quoting Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir.1995) (*quoting White v. York Int'l Corp.*, 45 F.3d 357, 361–62 (10th Cir. 1995))).

Defendants contend that plaintiff is not a "qualified individual with a disability" because she is unable to perform the essential functions of the OS position with or without reasonable accommodation. Specifically, defendants contend that plaintiff fails to reconcile her contradictory assertions that she was disabled from work for purposes of qualifying for disability benefits, yet she also was capable of performing her essential job functions for purposes of qualifying for protection under the ADA. *See Cleveland v. Policy Management Systems Corp.*, 523 U.S. 1070, 118 S.Ct. 1551, 140 L.Ed.2d 664 (1998). Defendants also contend that plaintiff is not a qualified individual with a disability because she could not perform the essential functions

of an OS position for reasons unrelated to her disability. Plaintiff maintains that there is no inconsistency in her application for disability benefits and her ADA claim and that defendants failed to provide her with reasonable accommodations that would have made her qualified to perform the OS position.

### 1. Essential functions

■ Essential functions of a position are those "that the individual who holds the position must be able to perform unaided or with the assistance of a reasonable accommodation." 29 C.F.R. Pt. 1630, App. 1630.2(n). When determining the essential functions of a job, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written job description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). The inquiry into the essential functions of a position is not intended to "second guess the employer or to require [the employer] to lower company standards." *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir.1995); *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1176–77 (10th Cir.1999). Where a function is essential, an employer is not required to eliminate the function as an accommodation for the employee. *See White*, 45 F.3d at 362.

Here, it is undisputed that defendants have a written job description for the OS position. The job description became effective on January 1, 1996. The description lists the overall functions of the OS position as follows:

Under little supervision, achieve the assigned sales quota consistent with the expectations of a thoroughly seasoned professional sales engineer in the assigned product category. Has the primary responsibility to manage and coordinate the sales effort within the customer/distributor base assigned.

More specifically, the job description states that an OS representative is responsible for "providing timely and accurate information for order entry," "elevating quality issues to attention of management," "ensur[ing] that accurate information flows to and from customers," "prepar[ing] and present[ing] bids and quotations to customers using company price and delivery guidelines [Bid–Man and Vista computer order systems]," "us[ing] sound business judgment to enhance margins," and being "an effective, contributing member of the sales ... teams."

The court finds that the functions listed in the job description for the OS position are presumptively the essential functions of that job. Although plaintiff asserts that not all functions listed in the defendants' job description are essential, she does not set forth any evidence to controvert the assumption established in the statute. *See* Fed.R.Civ.P. 56; 42 U.S.C. § 12111(8) (essential functions are presumptively contained in job description). Plaintiff does not dispute that "calling on electrical contractors [at their job sites], [preparing] job quotations, secur[ing] orders, [and] trouble-shooting in the field" are essential functions of the position. Further, plaintiff does not dispute that driving and having face-to-face contact with customers are essential functions. Nor does she dispute that the OS position involved travel 50–75% of the time. Additionally, it is undisputed that typing was a part of the job.

■ Plaintiff was restricted to part time work and restricted from driving through February 1998; therefore, she was unable to perform the essential function of driving at least until that date. Further, plaintiff testified that while in the inside sales position made available to her after her stroke, she was unable to work a full eight-hour day or to handle the stress of employment from January through May 1998. Therefore, plaintiff was compelled to go on short term disability leave. The court finds these admitted limitations rendered plain-

tiff unable to perform the essential functions of the OS position during the relevant time period from January to May 1998. Further, the court finds no reasonable fact finder could conclude that where plaintiff was unable to handle the stress of employment as an inside sales representative, she would have been able to handle the stress of employment as an OS representative. Plaintiff has not presented any evidence to the contrary. Moreover, plaintiff has presented no evidence that any particular accommodation from defendants would have assisted her to perform the essential functions of the OS position.[9]

### 2. Reasonable accommodations

Although plaintiff asserts that she "could have used a motorized cart for job sights (sic) that would have a basket for blue prints and other materials to be stored and transferred with me" there is no evidence this accommodation was raised while plaintiff was working for defendants. Further, plaintiff failed to include this contention in the parties Jointly Submitted Pre–Trial Order, and she is thereby precluded from raising the claim for the first time at this point in the litigation. *See Hullman v. Board of Trustees of Pratt Community College*, 950 F.2d 665, 667–68 (10th Cir.1991) (trial court has discretion to exclude issues not raised in pretrial order). Accordingly, the court does not consider it.

■ Plaintiff asserts that Dr. Carabetta's IME indicated she could perform the essential functions of lifting and carrying out duties in the field with assistance from customers or other sales representatives. Dr. Carabetta's suggestion is not conclusive that this accommodation was reasonable as a matter of law. Whether an accommodation is reasonable is governed by business needs of the employer and the nature of the job. *Anderson v. Coors*

*Brewing Co.*, 181 F.3d 1171, 1176–77 (10th Cir.1999).

Plaintiff presents no evidence that these accommodations would have assisted her to perform all essential functions of the job. Specifically, plaintiff has not presented evidence that any of the suggested accommodations would assist her to work a full eight-hour day in the OS position or to handle the stress of her employment. For these reasons the court finds plaintiff is not a qualified individual with a disability.

### 3. Prior inconsistent assertions

Defendant also contends that plaintiff is unable to reconcile her prior inconsistent statements regarding her ability to perform the essential functions of her job. In *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), the Supreme Court recently found that a claim for Social Security Disability Insurance ("SSDI") benefits is not inherently in conflict with a claim under the ADA. No "special negative presumption" should apply where an ADA plaintiff has applied for and received SSDI benefits. *Cleveland*, 526 U.S. at 802, 119 S.Ct. 1597. The "pursuit, and receipt, of SSDI benefits does not automatically estop" a recipient from pursuing an ADA claim. *Id.* at 1600. There are instances where an SSDI claim and an ADA claim can exist side by side. *Id.*

Where, however, an ADA plaintiff has made sworn assertions in an application for disability benefits that she is unable to work, these assertions appear to negate the essential element of an ADA claim that she can perform the essential functions of her job. *Id.* Therefore, where such an inconsistency exists, the court should require an explanation. *Id.* "To survive a defendant's motion for summary judgment, [a plaintiff] must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential

**9.** The evidence demonstrates that defendants initially provided plaintiff with an accommodation to assist her return to work following her stroke by creating a temporary part-time inside sales position with job functions within her medical restrictions.

functions' of her [ ] job, at least with 'reasonable accommodation.' " *Id.* at 1600.

Here, plaintiff asserted in her long-term disability application that she was unable to perform the OS functions of lifting and carrying and that it was difficult for her to park and walk to customer sites. Plaintiff's application also indicated that although her job duties had been modified she was still "unable to perform" the modified duties. Plaintiff further stated in the application that her job could not be further modified to enable her to return to work and that there were no other jobs she could perform. Plaintiff completed this application on December 2, 1998.

Similarly, plaintiff asserted in her Social Security disability application that her stroke compelled her to work fewer hours, modify her job duties, and make other job-related changes. Plaintiff stated: "The stroke caused me to go from outside sales to inside sales. I needed therapy during my employment and was forced to work fewer hours and miss work. No inside sales position existed previously. I was constantly tired, and am not able to work a full 8 hours a day." Plaintiff also represented on her application that she stopped working on May 18, 1998 for the following reasons: "Could not handle the job duties, the stress of employment responsibilities, and the pain level I endured while working. Due to my condition, my ability to work a full day was substantially impaired." Plaintiff completed the SSDI application on December 23, 1998. Plaintiff testified that her assertions in both the long term and the Social Security disability applications were accurate.

Plaintiff contends that because the time period relevant to her ADA claim is January through May 1998 and her applications were completed after that time period, her ADA claim does not present an inconsistency. Instead, plaintiff suggests that her ADA claim represents a different time period where her ability to perform work was greater. A change in an employee's condition as it relates to the timing of a

disability application and an ADA complaint may sufficiently explain a seeming inconsistency. *See Cleveland,* 526 U.S. at 802–03, 119 S.Ct. 1597 (timing may explain seeming inconsistency in disability and ADA claims).

▪ Here, the court does not find that a reasonable fact finder could conclude that plaintiff's representations are consistent. Plaintiff has testified that from January 1998 through May 1998 she had difficulties performing the functions of her modified job. It was these difficulties that prompted her to seek the available six months of short term disability leave. Immediately following cessation of her short term disability benefits, plaintiff began receiving long term disability benefits. Plaintiff has presented no evidence that her capacity to work changed from January to December 1998 such that she was not able to perform her job duties in December 1998, but able to perform them during the prior 11 months, six months of which she was on short term disability leave. Such an explanation contradicts plaintiff's own assertions.

Accordingly, the court does not find plaintiff has met her burden to explain the inconsistency between her disability benefit applications and her ADA claim. Therefore, for the reasons set forth above, summary judgment in favor of the defendant on plaintiff's claims of general disability discrimination, disability-based harassment and failure to accommodate is appropriate.

**4. Plaintiff's poor job performance**

▪ Even if plaintiff were a qualified individual with a disability under the analysis above, because plaintiff is unable to perform the essential function of the job for reasons unrelated to her disability, summary judgment would be appropriate for defendant. Where a disabled individual is unable to meet the requirements of a job for reasons other than her disability, she is not a qualified individual with a

disability as defined by the ADA. *See Bowers v. Bethany Medical Ctr.*, 959 F.Supp. 1385, 1391 (D.Kan.1997).

█ Here, the uncontroverted facts demonstrate that plaintiff was unable to master the new order entry systems installed during her absence in 1997, a task essential to an OS position. Further, the facts show that plaintiff was not consistently providing accurate information to the OS representatives that she supported. Moreover, plaintiff demonstrated a negative attitude toward working in the Kansas City sales office. Although plaintiff asserts she was not provided adequate training to assist her with the new order entry system, her own testimony contradicts this assertion. Therefore, plaintiff cannot demonstrate that she could perform all the essential functions of the OS position, and is not a qualified individual with a disability under the ADA. For this additional reason, summary judgment for defendant is appropriate.

Accordingly, the court finds plaintiff is not a qualified individual with a disability within the meaning of the ADA. Summary judgment in favor of defendant on plaintiff's claims of general disability discrimination, disability-based harassment and failure to accommodate is appropriate.[10]

## IV. Improper Medical Inquiry and Examination

Although the court has granted summary judgment to defendant on plaintiff's claims of general disability discrimination, disability-based harassment and failure to accommodate, two of plaintiff's claims remain. Plaintiff need not establish she is a qualified individual with a disability to maintain her claims that defendants made improper medical inquiries under the ADA

and retaliated against her for engaging in protected activity in violation of the ADA. *See* 42 U.S.C. §§ 12203(a) & 12112(d)(4)(A); *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 (10th Cir.1998) (prohibition against disability related inquiries not limited to qualified individuals with disabilities); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir.1997) (ADA retaliation claim available to individuals who are not individuals with a disability); *Matthews v. American States Ins. Co.*, 1997 WL 752442, *2 (D.Kan. Oct.21, 1997) (same).

Plaintiff claims defendant violated the ADA by making disability-related inquiries regarding plaintiff's health and requiring plaintiff to submit to a medical examination under 42 U.S.C. § 12112(d). Defendants maintain that all inquiries and examinations were job-related and consistent with business necessity in compliance with the ADA. As set forth in detail below, defendants' motion for summary judgment on this claim is granted in part.

The ADA prohibits an employer from making disability-related inquiries and from requiring medical examinations unless certain criteria are met. 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. § 1630.13(b). The ADA provides:

> A covered entity shall not require a medical examination and shall not make inquires of an employee as to whether such employee is an individual with a disability or as to the nature and extent of the disability, unless such examination is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A). This prohibition is intended to prevent inquiries of employees that do not serve legitimate business purposes. 29 C.F.R. Pt. 1630, App. § 1630.13(b). The statute clearly permits disability-related inquiries and

---

**10.** Plaintiff has not responded to defendants' summary judgment motion regarding plaintiff's claim of disability-based harassment. Accordingly, the court finds plaintiff has abandoned this claim. *See Edwards & Assoc., Inc. v. Black & Veatch, L.L.P.*, 84 F.Supp.2d 1182, 1197 (D.Kan.2000) (finding fraud claim

abandoned where plaintiff failed to respond to defendants arguments in summary judgment papers). Accordingly, summary judgment as to plaintiff's disability harassment claim is appropriate for this additional reason.

medical examinations, but only in limited circumstances. The focus is on the nature of the job-relatedness and on what constitutes a business necessity. *Id.*

### A. Inquiry to Dr. Kurth

On November 25, 1997, prior to plaintiff's return to work, defendants requested plaintiff's physician to provide the company with a written evaluation regarding plaintiff's "current state of health" and to address plaintiff's "ability or inability to return to work as a Senior Sales [OS] Representative." This request was job-related and consistent with business necessity. The ADA "permits employers or other covered entities to make inquiries or require medical examinations necessary to the reasonable accommodation process." 29 C.F.R. Pt. 1630, App. § 1630.14(c).

■ Where an employee has been on an extended leave of absence for medical reasons and returns to work with medical restrictions, an employer has a valid business interest in determining whether the employee can perform the essential functions of her job. Further, the employer has a valid business interest in determining whether the employee may need accommodations to perform the essential functions of their job. *See Martin v. Kansas,* 190 F.3d 1120, 1133–34 (10th Cir.1999) (finding voluntary disability disclosure policy permissible inquiry under ADA where purpose was to determine employees' ability to perform essential job functions and to provide reasonable accommodations as necessary). A limited inquiry seeking this information is consistent with business necessity. The court notes that plaintiff's physician replied to defendants' inquiry, placing restrictions on plaintiff's ability to return to full duty work for three months.

■ Although defendants requested broad information regarding plaintiff's "current state of health," this request was tempered by the language immediately following the request. Defendants specified they were interested in plaintiff's "ability or inability to return to work." The request was job-related. Based upon the evidence presented, the court finds no reasonable fact finder could conclude that defendants' request was not job-related and consistent with business necessity.

### B. Independent Medical Examination by Dr. Carabetta

In February 1998, approximately one month following plaintiff's return to work and prior to the expiration of her three month medical restrictions, defendants requested plaintiff submit to an IME to determine whether she was able to return to an OS position. Defendants requested that plaintiff have "all records, test results, etc." sent to Dr. Carabetta prior to the IME. Defendants followed up with correspondence to Dr. Carabetta's office indicating that they had requested plaintiff to have her doctors release "all **relevant** tests, records etc." to his office to assist him with his evaluation (emphasis added). Defendants also forwarded to Dr. Carabetta the following documents: 1) a job description of the [OS] sales engineer position; 2) a job analysis form reflecting the physical requirements of the job; 3) a medical assessment form regarding ability to do work-related activities; and 4) a physician statement form. Defendants requested that Dr. Carabetta perform the IME and determine plaintiff's " 'fitness' or 'inability' to perform the essential duties of [the OS] job." Defendants also requested any information regarding restrictions plaintiff may have in performing the job. Defendants' request for an IME was consistent with their business necessity. However, not all inquiries made as a part of this request were clearly job-related.

#### 1. Business necessity

Requiring plaintiff to submit to the IME was consistent with defendants' business necessity. Defendant had knowledge of plaintiff's desire to return to an OS position. Defendants also had knowledge of plaintiff's permanent limited mobility and of her medical restrictions scheduled to

last through February 1998. Plaintiff had represented to defendants that her doctor would release her from restrictions at the beginning of January, but had not provided medical documentation to that effect. Moreover, defendants had knowledge that plaintiff was having difficulties performing tasks in her modified inside sales position, tasks that were also necessary in the OS position. From this vantage point, defendants requested plaintiff to submit to an IME to determine if she could perform the essential functions of the OS position she desired.

■■■■ Defendants' knowledge created a justified concern to seek verification of plaintiff's ability to perform the OS job she desired. An employer may not require a medical examination where the employer has knowledge of an employee's health condition but has no other indicators that the employee cannot perform the job. *See Rodriguez v. Loctite Puerto Rico, Inc.*, 967 F.Supp. 653, 661 (D.P.R.1997) (ADA prevents medical examination where employer suspects an employee's health condition but has no justified concern about employee's ability to perform job). Here, defendants' knowledge of plaintiff's abilities, combined with plaintiff's desire to return to the OS position earlier than her physician's restrictions would allow, provided defendants with a legitimate concern about plaintiff's ability to perform the OS position. Defendants sought medical advice to determine if she could perform the job and if so, what accommodations would be necessary. Therefore, defendants' request that plaintiff submit to an IME was consistent with its business necessity to ensure plaintiff could perform the OS job she sought.

## 2. Job-related

All inquiries presented to Dr. Carabetta in conjunction with the IME were not clearly job-related. Plaintiff sets forth evidence that the inquiries made by defendants were overbroad and not job-related in violation of the ADA. Specifically, the evidence shows that one of the forms sent by defendants to Dr. Carabetta for use during the IME requested Dr. Carabetta to "determine [plaintiff's] ability to do work-related activities (sic) on a day-to-day basis in a regular work setting." Further, the form requested the physician to give "an assessment—BASED ON YOUR EXAMINATION—of how the individual's mental/emotional capabilities are affected by the impairment(s)." Specific questions on the form included: 1) "What medications currently is the employee taking? 2) Please include the dosage, frequency and any limitations. IE. Operating machinery;" and 3) "Is the employee receiving counseling?"

■■■■ Defendants requested information that was not clearly job-related. Requiring employees to disclose all legal, prescription medications used improperly solicits information about employees' disabilities in violation of the ADA. *See Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1230 (10th Cir.1997); *Gonzales v. Sandoval County*, 2 F.Supp.2d 1442, 1443–44 (D.N.M.1998) (noting employer limited to inquiring about the level of fitness necessary to perform the essential function of the job with or without reasonable accommodations).

■■■■ Defendants assert that where Dr. Carabetta provided information to defendants in the IME that was not clearly job-related, such actions may not be attributed to defendants. *See Swanigan v. Horsehead Resource Development Co., Inc.*, 1999 WL 755533 at 8 (N.D.Ill. 1999) (plaintiff may not rely on inference that company influenced physician to order a stress test as "subterfuge" to delay plaintiff's return to work). The court disagrees. Where specific questions are posed to a physician, even on a form for generalized use, the employer must bear the responsibility for posing them. Defendants did narrow their request to Dr. Carabetta by specifying that they were interested in plaintiff's " 'fitness' or 'inability' to perform the es-

sential duties of [the OS] job." However, the specific questions contained on forms defendants provided to Dr. Carabetta sought information potentially unnecessary to determine whether plaintiff could perform the essential functions of the OS position. Such questions may not be job-related. Here, viewing the evidence presented in the light most favorable to the plaintiff as the nonmoving party, the court finds a reasonable fact-finder could conclude that defendants' inquiries directed to Dr. Carabetta were not job-related, in violation of the ADA.

Accordingly, defendants' motion for summary judgment as to plaintiff's claim of unlawful disability-related inquiries and examinations is granted in part. Plaintiff's claims relating to medical inquiries directed to Dr. Kurth are dismissed. The court finds defendants' request that plaintiff undergo an IME with Dr. Carabetta was consistent with business necessity, but finds a reasonable fact finder could conclude inquiries posed by defendants to Dr. Carabetta in connection with the IME were not job-related.

Plaintiff also seeks summary judgment on her claims regarding improper medical inquiries and examinations under the ADA in her motion for partial summary judgment. Plaintiff has presented no evidence in her separate motion that has not been considered here. Accordingly, summary judgment for plaintiff on this remaining claim is inappropriate.

## V. Retaliation for Protected Activity

Plaintiff contends that, in retaliation for her request for an accommodation, defendants violated the ADA by treating her less favorably than other employees who did not assert their rights under the ADA. Plaintiff claims defendant took the following actions in retaliation for her accommodation request: 1) demoted plaintiff from the OS position to the inside sales job; 2) created a separate line of progression for plaintiff by requiring she succeed in the inside sales job before returning her to the OS position; 3) limited plaintiff's job duties based upon a presumption of what her capabilities were; 4) required plaintiff to "jump through hoops" to return to OS job; 5) more closely supervised and scrutinized plaintiff; 6) did not provide plaintiff with work to perform; 7) subjected plaintiff's work to stricter review; 8) did not provide training to plaintiff as it had to other employees who did not assert ADA rights; 9) requested plaintiff go on disability leave on several occasions; and 10) kept a separate attendance log for plaintiff.

The court analyzes plaintiff's retaliation claim under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 & n. 3 (10th Cir.1997) (analyzing plaintiff's Kansas Act Against Discrimination claims under *McDonnell Douglas* framework). In the summary judgment context, plaintiff initially must raise a genuine issue of material fact on each element of her prima facie case of retaliation. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997).

Once plaintiff establishes her prima facie case, the burden shifts to defendant to offer a legitimate nondiscriminatory reason for its employment decision. *Id.* (*citing Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995)). If the defendant "comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that 'there is a genuine dispute of material fact as to whether the employer's preferred reason for the challenged action is pretextual— i.e., unworthy of belief.'" *Id.* (*quoting Randle*, 69 F.3d at 451). A showing of pretext " 'gets plaintiff over the hurdle of summary judgment.'" *Id.* (*quoting Randle*, 69 F.3d at 452 (*quoting Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 n. 3 (10th Cir.1994))).

### A. Plaintiff's Prima Facie Case of Retaliation

■ To establish a prima facie case of retaliation under the ADA, plaintiff must

demonstrate that (1) she engaged in protected activity; (2) she suffered an adverse employment action thereafter; and (3) that the adverse action was taken because of her protected activity. *Houck v. City of Prairie Village*, 978 F.Supp. 1397, 1403 (D.Kan.1997).

■ The court concludes that plaintiff engaged in protected activity sufficient to establish the first element of her prima facie case when she requested to work from home and to be returned to the OS position.[11] *See Hutchings v. Kevin M. Kuebler, M.D., P.A.*, 5 F.Supp.2d 1186, 1197 (D.Kan.1998) (*citing Butler v. City of Prairie Village*, 974 F.Supp. 1386, 1402 (D.Kan.1997) (plaintiff may pursue a retaliation claim based on requesting accommodation provided that she had a good faith basis for believing she was entitled to the accommodation requested) (*citing McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir.1996))). It is questionable, however, whether plaintiff has made a sufficient showing on the second and third elements of her prima facie case.

### B. Pretext

■ Even assuming that plaintiff has established a prima facie case of retaliation, she has failed to raise any inference of pretext. Defendant has offered a legitimate, nondiscriminatory reason for its allegedly unlawful actions—plaintiff's demonstrated inability to satisfactorily perform the inside sales representative duties, which were fundamental to the OS position. The court finds plaintiff has not come forward with any evidence from which a reasonable fact finder could conclude that defendants' decisions were motivated by her requests for accommodation.

In an effort to show discriminatory animus on the part of defendants, plaintiff raises the following arguments. First, plaintiff asserts she was treated differently for purposes of training, job requirements, supervision, job scrutiny, and difference in lines of job progression as compared to other similarly situated employees. Plaintiff asserts other employees who were inside and outside sales representatives supervised by Mr. Fisher and working in the Kansas City office were similarly situated to her. The court does not agree with plaintiff's assertions.

The record shows that although plaintiff did not receive identical training as other employees on the new computer order systems, she was given opportunity for training, which she declined. The record also shows that plaintiff was not the only Kansas City employee for whom an attendance log was kept. In is undisputed that in response to plaintiff's concerns about the decrease in her quantity of work, Mr. Fisher requested that each of the salespeople in the Kansas City office provide more work to plaintiff. Moreover, the record shows plaintiff isolated herself from coworkers. Further, it is uncontroverted that plaintiff was not the only salesperson who worked as an inside sales representative before being placed into an OS position. Plaintiff herself followed this progression into an OS position prior to her leave of absence. Additionally, plaintiff has not presented evidence showing that any other salesperson was assigned to the OS position where they were unable to master the requisite computer programs or accurately perform sales quotes. Although it is undisputed that plaintiff is the only employee required to sign in under another employee's computer password to have her computer order entry work reviewed, plaintiff has not set forth evidence to establish that other employees were similarly situated by having similar performance problems. Plaintiff has not set forth evidence that she was treated differently than other similarly situated employees due to her accommodation request.

---

11. The court does not address the reasonableness of the suggested accommodations under the ADA.

Second, plaintiff suggests that an inference of discrimination can be drawn from evidence that defendants continually suggested plaintiff go on short term disability leave. Plaintiff's affidavit asserts she was "repeatedly urged" to "go on disability leave." Plaintiff testified, however, that defendants looked into the possibility of disability leave at her request. Plaintiff also testified that no representative of defendants ever indicated they wanted plaintiff to discontinue working at the company. The court finds no reasonable fact finder could conclude that defendants improperly urged plaintiff to go on disability leave.

Third, plaintiff asserts that defendants' argument suggesting customers who worked with plaintiff during the relevant time period indicated they did not want to work with plaintiff due to problems with her performance gives rise to an inference of discrimination. Plaintiff has provided an affidavit from Jeff Schlitzer, an employee at Electrical Materials and a customer with whom she worked in the OS position, stating that contrary to defendants' assertion, his company did not make complaints about plaintiff's performance following her return to work. Plaintiff speculates that this information was provided for pretextual reasons.

▪ Evidence inviting pure speculation is insufficient to raise a genuine issue of material fact for trial. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988) (mere conjecture that an employer's explanation is a pretext for intentional discrimination is insufficient to satisfy a plaintiff's pretext burden); *Morgan v. Hilti, Inc.*, 108 F.3d

1319, 1324 (10th Cir.1997) (affirming summary judgment on ADA retaliation claim where plaintiff "has not cast doubt on [defendant's] facially nondiscriminatory explanation for its actions"). Mr. Schlitzer's affidavit does suggest an inconsistency in defendants' account of events. The court finds that this inconsistency does not give rise to an inference of discrimination, in light of the fact that defendants do not represent that the complaints from Electrical Materials alone provide support for their actions towards plaintiff. Accordingly, the court finds that no reasonable fact finder could conclude from this inconsistency that defendants' proferred reasons are pretextual.

Fourth, plaintiff asserts that because the OS position and inside sales position are completely different, defendants' proferred reasons are pretextual. Although the record shows there are differences between the positions, plaintiff has not set forth evidence that there is no overlap in duties between the positions.

Finally, plaintiff asserts that defendants' failure to write up other employees whose sales quotas were decreased gives rise to an inference of discrimination. The court does not agree. There is no suggestion made nor evidence presented to establish that actions were taken by defendants towards plaintiff as a result of a decrease in her sales quota.

Accordingly, the evidence set forth by plaintiff does not give rise to an inference of discriminatory animus based on retaliation for plaintiff's accommodation request.[12] Plaintiff has not come forward

12. Plaintiff also asserts an inference of discrimination may be drawn from Mr. Android's statement to Mr. Hughes that plaintiff could not do the job, should get a third medical evaluation and would most likely be on medical leave in the future. These facts are not a part of the record in this case. Plaintiff provides the court an exhibit allegedly containing Mr. Hughes' handwritten notes of a meeting with Mr. Android, wherein Mr. Android recounted his thoughts regarding plaintiff's ability to work. This document is not authenticated, and therefore, not proper Rule 56 evidence. *See* Fed.R.Civ.P. 56(c) & (e); D.Kan.Rule 56.1. Out of an abundance of caution the court has examined the argument based upon this exhibit. The court finds Mr. Android's comments do not give rise to an inference of discrimination. Plaintiff has set forth no evidence that defendants acted upon Mr. Android's beliefs in early March following the results of the IME, or that plaintiff was not having performance difficulties, the proferred reason for defendants' actions.

with sufficient evidence from which a reasonable fact finder could draw an inference that the defendants' proferred reasons for its allegedly adverse actions are unworthy of belief or that plaintiff's request for an accommodation was a motivating factor in the defendants' decisions. There is no evidence in the record that defendant retaliated against plaintiff for requesting an accommodation. The uncontroverted facts indicate that defendant granted plaintiff a modified job in inside sales, and was willing to return her to OS when she was qualified. For these reasons, defendant is entitled to summary judgment on plaintiff's retaliation claim.

## VI. Summary of Court's Ruling

IT IS THEREFORE ORDERED THAT defendants' motion for summary judgment (Doc. 33) on plaintiff's claims of general disability discrimination, disability-based harassment and failure to accommodate is granted. These claims as they appear in plaintiff's complaint are dismissed in their entirety.

IT IS FURTHER ORDERED THAT defendants' motion for summary judgment (Doc. 33) on plaintiff's claim of improper medical inquiry/examination under the ADA is granted in part. Plaintiff may proceed with her claim that the inquiries posed to Dr. Carabetta in conjunction with the IME were not job-related. All other aspects of this claim as it appears in plaintiff's complaint are dismissed.

IT IS FURTHER ORDERED THAT defendants' motion for summary judgment (Doc. 33) on plaintiff's claim of retaliation under the ADA is granted. This claim as it appears in plaintiff's complaint is dismissed in its entirety.

IT IS FURTHER ORDERED THAT plaintiff's motion for partial summary judgment (Doc. 36) is rendered MOOT by

the court's ruling on defendants' motion for summary judgment in this matter.

Additionally, the court has reviewed the additional arguments set forth by plaintiff to establish pretext and finds them unpersuasive in that they fail to give rise to an inference of discrimination or to call into doubt defendants' proferred legitimate nondiscriminatory reasons.